FEDERAL POWER COMMISSION *v.* MEMPHIS LIGHT, GAS & WATER DIVISION ET AL.

No. 72–486.   Argued March 27, 1973—Decided May 7, 1973*

DOUGLAS, J., delivered the opinion for a unanimous Court.

*Samuel Huntington* argued the cause for petitioner in No. 72–486.   With him on the brief were *Solicitor General Griswold, Leo E. Forquer,* and *George W. McHenry, Jr.   Christopher T. Boland* argued the cause for petitioner in No. 72–488.   With him on the briefs were *Melvin Richter* and *Robert O. Koch.*

*George E. Morrow* argued the cause for respondent Memphis Light, Gas & Water Division in both cases. With him on the brief was *Reuben Goldberg.   Richard A. Solomon* argued the cause and filed a brief for respondent Public Service Commission for the State of New York in both cases.   *Charles F. Wheatley, Jr.,* and

*Together with No. 72–488, *Texas Gas Transmission Corp.* v. *Memphis Light, Gas & Water Division et al.,* also on certiorari to the same court.

*William T. Miller* filed a brief for respondent American public Gas Assn. in both cases.†

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

We granted certiorari in these cases to determine whether § 441 of the Tax Reform Act of 1969, 26 U. S. C. § 167 (*l*), circumscribes the authority of the Federal Power Commission under the Natural Gas Act, 52 Stat. 821, as amended, 15 U. S. C. § 717 *et seq.*, to permit a regulated utility to change its method of computing depreciation for ratemaking purposes from "flow-through" to "normalization" with respect to property acquired prior to 1970 as well as "replacement" property.

Since the resolution of this issue depends largely on the background and history of § 441 and the Commission's regulatory powers, a brief review is in order at the outset. Section 167 of the Internal Revenue Code authorized taxpayers, including regulated utilities, to use accelerated or liberalized depreciation in calculating their federal income taxes.[1] The Commission re-

---

†Briefs of *amici curiae* urging reversal in both cases were filed by *Jerome J. McGrath* for the Independent Natural Gas Association of America, and by *Thomas M. Debevoise* for Jersey Central Power & Light Co. et al.

[1] Section 167 (a) provides that "[t]here shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)" of qualified property. Section 167 (b) defines "reasonable allowance" to include an allowance computed under the declining balance method and the sum-of-the-years-digits method, as well as the straight-line method. Under the declining-balance and sum-of-the-years-digits method, both commonly referred to as accelerated or liberalized depreciation methods, depreciation allowances in the early years are higher than under the straight-line method, but steadily decrease over the useful life of the asset. Under the straight-line method, the depreciation allowance for an asset remains equal over its useful life.

tained jurisdiction to prescribe the depreciation method to be used by regulated utilities in calculating their federal income tax expense for ratemaking purposes.[2] Initially, the Commission required utilities to compute their cost of service, which includes federal income taxes, as if they were using straight-line depreciation. This method, referred to as "normalization," was designed to avoid giving the present customers of a utility the benefits of tax deferral attributable to accelerated depreciation. If a utility used accelerated depreciation in determining its actual tax liability, the difference between the taxes actually paid and the higher taxes reflected as a cost of service for ratemaking purposes was required to be placed in a deferred tax reserve account. See *Amere Gas Utilities Co.*, 15 F. P. C. 760.

It soon became apparent that accelerated depreciation in practice resulted in permanent tax savings. Because most utilities had growing or at least stable plant investments, the depreciation allowances from additional and replacement equipment offset the declining depreciation allowance on existing property. Accordingly, the Commission required utilities using accelerated depreciation for tax purposes to use the same method for calculating their cost of service and, thus, to "flow through" any tax savings to their customers. *Alabama-Tennessee Natural Gas Co.*, 31 F. P. C. 208, aff'd *sub nom. Alabama-Tennessee Natural Gas Co. v. FPC*, 359 F. 2d 318 (CA5). Subsequently, the Commission decided that it would impute the use of accelerated depreciation for ratemaking purposes regardless of the method used for computing actual taxes. *Midwestern Gas Transmission Co.*, 36

---

[2] Federal income taxes are properly included as an expense under the cost-of-service ratemaking utilized by the Commission in the regulation of rates for sales of natural gas subject to its jurisdiction under the Natural Gas Act, 15 U. S. C. § 717 *et seq.* See *FPC v. United Gas Pipe Line Co.*, 386 U. S. 237, 243.

F. P. C. 61, aff'd *sub nom. Midwestern Gas Transmission Co. v. FPC,* 388 F. 2d 444 (CA7).

When the House and Senate considered tax reform legislation in 1969, both were concerned with the loss of tax revenues that stemmed from the combined effect of accelerated depreciation for computing federal taxes (leading to higher deductions) and flow-through for fixing rates (leading to lower rates and thus lower gross revenues).[3] Section 441 of the Tax Reform Act, which added § 167 (*l*) to the Internal Revenue Code, was designed in general to "freeze" existing depreciation practices.[4] As passed by the House, § 441 would have established three rules with respect to existing depreciable property:[5]

"(1) If straight line depreciation is presently being taken, then no faster depreciation is to be permitted as to that property.

"(2) If the taxpayer is taking accelerated depreciation and is 'normalizing' its deferred taxes, then it must go to the straight line method unless it continues to normalize as to that property.

"(3) If the taxpayer is taking accelerated depreciation and flowing through to its customers the benefits of the deferred taxes, then the taxpayer must continue to do so, unless the appropriate regulatory agency permits a change as to that property."

The Senate bill as passed was similar to that of the House, except that utilities on flow-through were given the right to elect within 180 days "to shift from the flow-through to the straight-line method, with or without the permission of the appropriate regulatory agency, or . . .

---

[3] See H. R. Rep. No. 91–413, pt. 1, pp. 131–132; S. Rep. No. 91–552, p. 172.

[4] See H. R. Rep. No. 91–413, pt. 1, pp. 132–133; S. Rep. No. 91–552, p. 172.

[5] H R. Rep. No. 91–413, pt. 1, p. 133.

with the permission of the regulatory agency to shift to the normalization method . . . ." [6] This election was to apply both to new and existing property. In conference, however, it was agreed that this right of election would apply only to property acquired by the utility after 1969 to expand its facilities. [7]

Thus, as added to the Internal Revenue Code in 1969, § 167 (*l*) distinguishes between two basic types of "public utility property": [8] "pre-1970 property," which is property acquired by the taxpayer before January 1, 1970 (§ 167 (*l*)(3)(B)), and all other property, referred to as "post-1969 property" (§ 167 (*l*)(3)(C)). A further distinction is drawn between post-1969 property "which increases the productive or operational capacity of the taxpayer" (expansion property) and post-1969 property which merely replaces existing property (§ 167 (*l*)(4)(A)). With respect to pre-1970 property, a utility may use (1) straight-line depreciation, (2) the method used prior to August 1969 if it also employs normalization, or (3) accelerated depreciation with flow-through, but only if that method was used prior to August 1969

---

[6] S. Rep. No. 91–552, p. 173.

[7] See H. R. Conf. Rep. No. 91–782, p. 313.

[8] Section 167 (*l*)(3)(A) provides:

"The term 'public utility property' means property used predominantly in the trade or business of the furnishing or sale of—

"(i) electrical energy, water, or sewage disposal services,

"(ii) gas or steam through a local distribution system,

"(iii) telephone services, or other communication services if furnished or sold by the Communications Satellite Corporation for purposes authorized by the Communications Satellite Act of 1962 (47 U. S. C. [§] 701), or

"(iv) transportation of gas or steam by pipeline,

"if the rates for such furnishing or sale, as the case may be, have been established or approved by a State or political subdivision thereof, by any agency or instrumentality of the United States, or by a public service or public utility commission or other similar body of any State or political subdivision thereof."

(§ 167 ($l$)(1)). With respect to post-1969 property, a utility may use (1) straight-line depreciation, (2) accelerated depreciation with normalization, or (3) accelerated depreciation with flow-through if the utility used flow-through prior to August 1969 (§ 167 ($l$)(2)). In addition, under § 167 ($l$)(4)(A), a utility may elect to abandon accelerated depreciation with flow-through with respect to post-1969 expansion property.

The proceedings in issue here involve Texas Gas Transmission Corp., the operator of a major interstate pipeline system certificated by the Federal Power Commission. Although Texas Gas utilized accelerated depreciation with flow-through prior to the adoption of the Tax Reform Act, it filed a proposed rate increase with the Commission on June 27, 1969, based upon "the proposed discontinuance of the use of liberalized depreciation and the reversion to a straight-line method of tax depreciation." After § 167 ($l$) was enacted, Texas Gas advised the Commission that it intended to exercise the election provided in § 167($l$)(4)(A) and sought permission to use accelerated depreciation with normalization with respect to its post-1969 expansion property.[9] It also sought assurance, before it made the election, that it would be able to change from flow-through to straight-line or, preferably, accelerated depreciation with normalization with respect to its pre-1970 property and post-1969 replacement property.

The Commission, holding that its authority "to determine whether a company may effect such a change is not

---

[9] In Order No. 404, 43 F. P. C. 740, rehearing denied, 44 F. P. C. 16, the Commission announced that as a general policy it would permit utilities making the election under § 167 ($l$)(4)(A) to use accelerated depreciation with normalization with respect to their expansion property. The Court of Appeals, in the same decision under review here, affirmed this order. 149 U. S. App. D. C. 238, 250, 462 F. 2d 853, 865. That part of the court's decision is not before us.

diminished" under the Tax Reform Act, permitted Texas Gas to change from flow-through to normalization for ratemaking purposes. Opinion No. 578, 43 F. P. C. 824, 828, rehearing denied, 44 F. P. C. 140.[10] The Commission reasoned that the basis of its decisions in *Alabama-Tennessee* and *Midwestern* would no longer be applicable if Texas Gas were to switch to normalization with respect to post-1969 expansion property. In that event, the tax savings resulting from the deferral attributable to accelerated depreciation would not be permanent. Rather, if Texas Gas were required to continue flow-through for all but its new expansion property, it would be faced with a steadily increasing cost of service which would necessitate repeated rate increases. Under these circumstances, the Commission concluded: "Texas Gas is correct in contending that normalization in computing the tax allowance for rate purposes with respect to its pre-1970 facilities offers more hope for stability of rates for its customers and more assurance that the company can earn its fair rate of return without future rate increases. Further benefits of normalization are that it will improve the company's before tax coverage of interest, thereby

[10] The Commission's order reads:

"(A) In the computation of its Federal Income Tax allowance for ratemaking purposes as well as for accounting purposes, Texas Gas is permitted to use liberalized depreciation with normalization with respect to its property other than that subject to election under Section 167 (*l*) (4) (A) of the Internal Revenue Code as amended by Section 441 of the Tax Reform Act of 1969. Such election applies to property constructed or acquired on or after January 1, 1970, to the extent it increases the productive or operational capacity of the company and does not represent the replacement of existing capacity. Texas Gas may reflect any such change in its rates, as well as any change in costs arising from its proposed election. In computing its cost-of-service for ratemaking purposes balances in Account 282 [deferred tax reserve account] should continue to be deducted from the rate base." 43 F. P. C. 824, 831.

enhancing the quality of its securities, and that it will help alleviate present day cash shortages." *Id.*, at 829–830.

The Court of Appeals, on petitions for review, reversed the Commission's order.[11]  149 U. S. App. D. C. 238, 462 F. 2d 853, rehearing denied, *id.*, at 250, 462 F. 2d, at 865.  Although the Court recognized that the version of the Tax Reform Act passed by the House would have supported the Commission's order, it held that the limited nature of the election provision as finally passed deprived the Commission of authority to permit regulated utilties to abandon flow-through with respect to their existing and replacement property.  We reverse and remand to the Court of Appeals for further proceedings consistent with this opinion.

The present cases concern solely the depreciation methods used by utilities in calculating their federal income tax expenses for ratemaking purposes.

In § 441 of the Tax Reform Act of 1969, Congress dealt primarily with a revenue measure under the tax laws and only indirectly with the regulatory power of the Commission under the Natural Gas Act.  We have had before us on numerous occasions cases arising under the Natural Gas Act.  In the early case of *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, we emphasized two aspects of the power of the Commission to fix "just and reasonable" rates under 15 U. S. C. § 717.  First, was the desire "to protect consumers against exploitation," 320 U. S., at 610,

---

[11] Memphis Light, Gas & Water Division, a municipally owned distributor of natural gas and a city-gate customer of Texas Gas, and the Public Service Commission of the State of New York petitioned the Court of Appeals for review of the Commission's Opinion No. 578. Each had filed an application for rehearing before the Commission which was denied in Opinion No. 578–A.  Both the Federal Power Commission (in No. 72–486) and Texas Gas (in No. 72–488) petitioned this Court for a writ of certiorari.

and second, was the aim to promote the "financial integrity" of the natural gas companies as measured, not only by revenues sufficient to recover operating expenses and capital costs, *id.*, at 603, but also by revenues "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Ibid.* We mention those matters because (1) the treatment of depreciation bears on rates and (2) there is no indication in the legislative history of this tax measure that Congress desired to modify, as respects the precise issue involved here, the broad discretion of the Commission delineated in *Hope Natural Gas* and in other rate cases.

Under § 4 (a) of the Natural Gas Act, 15 U. S. C. § 717c (a), all rates and charges made by a natural gas company subject to the Commission's jurisdiction must be "just and reasonable." Section 4 (e), 15 U. S. C. § 717c (e), sets forth the procedures whereby the Commission can determine whether a proposed rate schedule is lawful, and § 5, 15 U. S. C. § 717d, gives the Commission certain powers to fix rates and charges. Finally, under § 9 (a), 15 U. S. C. § 717h (a), the Commission may "require natural-gas companies to carry proper and adequate depreciation and amortization accounts in accordance with such rules, regulations, and forms of account as the Commission may prescribe." In *FPC* v. *United Gas Pipe Line Co.*, 386 U. S. 237, 243, the Court stated:

> "One of [the Commission's] statutory duties is to determine just and reasonable rates which will be sufficient to permit the company to recover its costs of service and a reasonable return on its investment. Cost of service is therefore a major focus of inquiry. Normally included as a cost of service is a proper allowance for taxes, including federal income taxes. The determination of this allowance, as a general

proposition, is obviously within the jurisdiction of the Commission."

The lower courts have allowed the Commission broad discretion in determining proper depreciation methods for ratemaking purposes. See, *e. g., Alabama-Tennessee Natural Gas Go.* v. *FPC*, 359 F. 2d 318; *Midwestern Gas Transmission Co.* v. *FPC*, 388 F. 2d 444.

Section 167 (*l*), to be sure, does not leave this discretion untouched. For example, a utility using straight-line depreciation with respect to its pre-1970 property could not switch to accelerated depreciation, nor could a utility be required to switch to flow-through with respect to pre-1970 property. See § 167 (*l*)(1). But § 167 (*l*) on its face does not preclude the Commission from exercising its statutory powers to permit a utility to abandon flow-through. Section 167(*l*)(1)(B) provides that "[i]n the case of any pre-1970 public utility property, the taxpayer *may* use the applicable 1968 method for such property if—(i) the taxpayer used a flow-through method of accounting" prior to August 1969. (Emphasis added.)

The Court of Appeals, however, found error in the Commission's action based on its detailed and considered analysis of the legislative history of § 167 (*l*). It concluded that *"the final version of the bill limits the applicability of the right of election to post-1969 expansion (non-replacement) property alone."* 149 U. S. App. D. C., at 246, 462 F. 2d, at 861 (emphasis in original). It reasoned as follows. At the House stage the action of the Commission would have been justified to switch to normalization because, as already noted, the House Report stated: [12]

"Your committee's bill provides that, in the case of *existing* property, the following rules are to apply:

---

[12] H. R. Rep. No. 91–413, pt. 1, p. 133.

"(1) If straight line depreciation is presently being taken, then no faster depreciation is to be permitted as to that property.

"(2) If the taxpayer is taking accelerated depreciation and is 'normalizing' its deferred taxes, then it must go to the straight line method unless it continues to normalize as to that property.

"(3) If the taxpayer is taking accelerated depreciation and flowing through to its customers the benefits of the deferred taxes, then the taxpayer must continue to do so, *unless the appropriate regulatory agency permits a change as to that property.*" (Emphasis added.)

The word "existing" property as used in that Report included "replacement" property in the mind of the Court of Appeals.

The Senate version of the bill [13] would have permitted Texas Gas to shift from liberalized depreciation with flow-through either to straight-line depreciation or with the Commission's approval to liberalized depreciation with normalization. 149 U. S. App. D. C., at 247, 462 F. 2d, at 862.

---

[13] S. Rep. No. 91–552, pp. 173–174

"The [Senate] committee amendments, while in most respects the same as the House provisions, differ in one principal area. The amendments permit an election to be made within 180 days after the date of enactment of the bill for a utility covered by this provision to shift from the flow-through to the straight-line method, *with or without the permission of the appropriate regulatory agency, or permit it with the permission of the regulatory agency to shift to the normalization method* (that is, to come under general rules of the bill).

"*This election applies both as to new and existing property. . . .* Since the company would no longer be permitted to use accelerated depreciation (unless the agency later permits it to normalize), the agency would not be able to impute the use of accelerated depreciation with flow-through." (Emphasis added.)

The Court of Appeals, however, concluded that because the right of election was restricted while the bill was in conference to apply only to post-1969 expansion property, the Commission could not permit a utility to change its method with respect to existing or replacement property. *Ibid.* It relied on the following four paragraphs from the Conference Report.[14]

"The House bill provides that in the case of certain listed regulated industries (the furnishing or sale of . . . gas through a local distribution system, . . . and transportation of gas by pipeline) a taxpayer is *not permitted* to use accelerated depreciation *unless it 'normalizes'* the current income tax reduction resulting from the use of such accelerated depreciation. . . .

"*This rule is not to apply in the case of a taxpayer that is at present flowing through the tax reduction to earnings for purposes of computing its allowable expenses on its regulated books of account.* Also, if the taxpayer is now using straight line depreciation as to any public utility property it may not change to accelerated depreciation as to that property.

"The Senate amendment makes the following changes in the House bill: . . . (d) *an election is permitted to be made within 180 days after the date of enactment by a company at present on flow-through to come under the rules of the bill* . . . .

"*The conference substitute (sec. 441 of the substitute and sec. 167 (l) of the code) follows the Senate amendment except that the special provision referred to in (e) above is stricken and the 180-day election (item (d), above) is modified to apply to new property and not to replacement property.*

---

[14] H. R. Conf. Rep. No. 91–782, pp. 312–313.

*Even in the case of new property, however, the right to change over from the flowthrough method is to be available only to the extent the new property increases the productive or operational capacity of the company."* (Emphasis added.)

From these four paragraphs the Court of Appeals concluded that the second paragraph of the Conference Report prohibits Texas Gas from abandoning liberalized depreciation with flow-through and that the right of election was restricted to post-1969 expansion property only.

The second paragraph, however, as we read it, when it uses the words "This rule" refers, not to the final bill, but to the initial House bill. That initial bill, as summarized in the House Report, as already noted,[15] had somewhat different provisions for depreciation. The first paragraph of the quotation from the Conference Report in our view summarized the House's proposed second rule. The words "This rule" in the second paragraph, therefore, refer to the House's proposed second rule.[16] Only the third paragraph of the excerpt reached the changes made by the Senate. Only the fourth paragraph resolved the differences between the two bills. There is nothing in either the third or the fourth paragraph to indicate that the election authorized by the Conference Report was to limit or replace the three general rules proposed by the House, the third House-proposed rule [17]

---

[15] H. R. Rep. No. 91–413, pt. 1, p. 133.

[16] The second rule, as noted, provided, "If the taxpayer is taking accelerated depreciation and is 'normalizing' its deferred taxes, then it must go to the straight line method unless it continues to normalize as to that property." *Ibid.*

[17] The third rule, as noted, provided, "If the taxpayer is taking accelerated depreciation and flowing through to its customers the benefits of the deferred taxes, then the taxpayer must continue to do so, unless the appropriate regulatory agency permits a change as to that property." *Ibid.*

authorizing precisely what the Commission allowed in this case. The second paragraph, read in the context of the Conference Report, does not state that the Commission lacks authority to permit a company on flow-through to abandon it with respect to existing property. It only states that a company on flow-through may remain on flow-through. Thus, it is solely a limitation on the requirement that a company must normalize if it wants to continue accelerated depreciation with respect to pre-1970 property. This is entirely consistent with the structure of § 167 $(l)(1)$.

Nor is the extension of the 180-day election to post-1969 expansion property a limiting factor. The "reasonable" allowance for depreciation of post-1969 property as used in § 167 $(l)(2)$ includes in subparagraph (C) "the applicable 1968 method, if, with respect to its pre-1970 public utility property of the same (or similar) kind most recently placed in service, the taxpayer used a flow-through method of accounting for its July 1969 accounting period." But § 167 $(l)(4)(A)$ provides that where the taxpayer makes an election within the 180-day period, paragraph (2)(C) shall not apply with respect to any post-1969 public utility property "to the extent that such property constitutes property which increases the productive or operational capacity of the taxpayer" and does not represent "the replacement of existing capacity."

Thus, the Act recognizes ways for a utility to abandon flow-through with respect to existing property. A utility cannot do so on its own; the overriding authority is in the Federal Power Commission. The staff of the Joint Committee on Internal Revenue Taxation prepared a General Explanation of this tax measure [18] in which it stated:

"If the taxpayer was taking accelerated deprecia-

[18] General Explanation of the Tax Reform Act of 1969, H. R. 13270, 91st Cong., p. 151.

tion and flowing through to its customers the benefits of the deferred taxes as of August 1, 1969, then the taxpayer would continue to do so (except for a special election procedure discussed below), unless the appropriate regulatory agency permits a change as to that property."

This document goes on to state [19] that as respects new property a utility on flow-through must remain on flow-through "unless the regulatory agency permits it to change (or unless the election below applies)."

This document provides a compelling contemporary indication that the Federal Power Commission was not deprived of its authority to permit abandonment of flow-through, even though utilities had the right not to have flow-through apply to their expansion property.

The Court of Appeals relied on comments both in the House [20] and in the Senate [21] Reports of the desire of Congress to "freeze" the current practices relating to depreciation especially as respects "the more flourishing utility industries." [22]

As we read the Reports, the purpose was to forestall switches to faster methods of depreciation, to guard against widespread rate increases, and to avoid putting some utilities at a competitive disadvantage. But the "freeze" was not put in absolute terms. Shifts from straight-line to accelerated depreciation were outlawed, as were shifts from normalization to flow-through on existing property. We find no trace of a suggestion that the Federal Power Commission was denied authority to determine whether on particular facts the abandonment of flow-through by a utility within the parameter of the

[19] *Ibid.*
[20] H. R. Rep. No. 91–413, pt. 1, pp. 132–133.
[21] S. Rep. No. 91–552, p. 172
[22] *Ibid.*

Tax Reform Act of 1969 would be in the public interest as envisaged by the Natural Gas Act, even though it might increase rates. The "freeze" certainly was designed to cover changes to faster methods of tax depreciation but not changes to slower methods of tax depreciation that the Commission might permit.

The Court of Appeals sustained the Commission as respects the post-1969 expansion property of Texas Gas, and reversed it as respects the pre-1970 and post-1969 nonexpansion property. The Court of Appeals did not reach the validity of the Commission's order, assuming the Commission was correct in its reading of the Tax Reform Act of 1969, as we think it was. The Court of Appeals did, however, state that § 167 (l) "should not be construed to prevent" the Commission from finding in "extraordinary circumstances" that consumer interests "would be furthered by permitting the abandonment of flow-through." But it added: "It is clear, however, that such consumer interests would not be furthered by permitting Texas Gas to abandon flow-through in the circumstances presented by the case at bar." 149 U. S. App. D. C., at 250, 462 F. 2d, at 865. The Commission in its petition for certiorari states that in connection with the main question raised it would argue, if the petition were granted, that its decision on the merits was correct in all respects. And in its brief on the merits it urges us to decide the merits. But by statute [23] the Court of

---

[23] Section 19 (b) of the Natural Gas Act, 15 U. S. C. § 717r (b), provides:

"Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia [Circuit] . . . ."

Appeals is the tribunal where review must be sought; and we remand the cases to it for proceedings consistent with this opinion. We note in closing, however, that the judgment of the Court of Appeals is reversed *in toto*. Its holding that the consumer interests were not furthered by the Commission's action is short of the application of the appropriate standard for review. As already noted, under *Hope Natural Gas* rates are "just and reasonable" only if consumer interests are protected and if the financial health of the pipeline in our economic system remains strong.

*Reversed and remanded.*