**MEMPHIS LIGHT, GAS AND WATER DIVISION, Petitioner,**

**v.**

**FEDERAL POWER COMMISSION, Respondent,**

**Texas Gas Transmission Corporation and Tennessee Valley Municipal Gas Association, etc., Intervenors.**

**PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Petitioner,**

**v.**

**FEDERAL POWER COMMISSION, Respondent,**

**Texas Gas Transmission Corporation, Intervenor.**

**Nos. 24517, 24632.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 25, 1974.

Decided June 26, 1974.

Richard A. Solomon, Washington, D. C., for petitioner in No. 24632.

George E. Morrow, Memphis, Tenn., with whom Reuben Goldberg, Washing-ton, D. C., was on the brief, for petitioner in No. 24517.

Charles E. Bullock, Atty., F. P. C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Sol., F. P. C., were on the brief, for respondent.

Christopher T. Boland, Washington, D. C., with whom Melvin Richter, Washington, D. C., was on the brief for intervenor, Texas Gas Transmission Corp. George J. Meiburger, Washington, D. C., also entered an appearance for intervenor, Texas Gas Transmission Corp.

Reuben Goldberg, Washington, D. C., entered an appearance for intervenors Tennessee Valley Municipal Gas Assn., et al.

Before FAHY, Senior Circuit Judge, ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This case reaches us on remand from the Supreme Court, which held that section 441 of the Tax Reform Act of 1969 [1] does not limit the authority of the Federal Power Commission [FPC] under the Natural Gas Act [2] to permit a regulated utility to change for ratemaking purposes its method of depreciation on pre-1970 and replacement property from flow-through to normalization.[3] This court must now review on other grounds the validity of the FPC's decision to allow Texas Gas Transmission Corporation [Texas Gas] to make such a shift in depreciation practices.

I. *The Circumstances Underlying this Appeal*

In June 1969 Texas Gas filed a rate increase with the FPC.[4] In its accompanying statement of reasons for the requested change Texas Gas attributed as a cause of the increase its proposed discontinuance of the use of liberalized depreciation and reversion to straight-line depreciation.[5] At the ensuing hearing

---

1. 26 U.S.C. § 167(*l*).

2. 15 U.S.C. § 717 et seq.

3. FPC v. Memphis Light, Gas & Water Division, 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973).

4. Joint Appendix [hereinafter App.] at 47.

5. App. at 53.

the Presiding Examiner segregated the issues involved into two phases, Phase I to consist of questions of rate of return, associated income taxes, and reversion to straight-line depreciation. After settlement of many issues by the parties the FPC was left with the depreciation question to resolve. Following briefing by the parties, but without oral argument, the FPC issued in June 1970 an order permitting Texas Gas to change its method of liberalized depreciation for rate-making purposes from flow-through to normalization with respect to pre-1970 and post-1969 non-expansion property.[6] This decision was reaffirmed by the FPC in its Opinion and Order Denying Rehearing in July 1970.[7]

An appeal to this court was then taken. We held that the Tax Reform Act had deprived the FPC of the authority to allow such a change in depreciation methods.[8] However, the Supreme Court then held that the FPC retained such authority[9] and remanded the case to this court to decide the merits pursuant to section 19(b) of the Natural Gas Act.[10]

Two primary aspects of the FPC decision are challenged in this appeal. First, was there substantial evidence on which the FPC based its decision? Second, were the parties sufficiently apprised of the possible remedy of a shift to normalization, as opposed to straight-line depreciation?

## II. *The Substantial Evidence Question*

Memphis Light, Gas and Water Division [Memphis Light] and Public Service Commission of the State of New York [Public Service] challenge as lacking substantial evidence the FPC's decision allowing Texas Gas to normalize[11] its federal income taxes in computing its rates. Specifically they attack the FPC's findings that liberalized depreciation on non-expansion property[12] will no longer produce permanent tax savings, and that tax savings on expansion property[13] will not be available to offset declining depreciation on older properties.

## A.

■ At the outset we note that the scope of our review is limited, for Congress has ordained that the FPC is to be granted broad discretion in the regulation of the natural gas industry. The Supreme Court has acknowledged the

---

6. FPC Opinion No. 578, 43 F.P.C. 824 (1970), App. at 100.

7. FPC Opinion No. 578–A, 44 F.P.C. 140 (1970), App. at 145.

8. Memphis Light, Gas & Water Division v. FPC, 149 U.S.App.D.C. 238, 462 F.2d 853, rehearing denied, 149 U.S.App.D.C. 250, 462 F.2d 865 (1972).

9. 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973).

10. 15 U.S.C. § 717r(b).

11. Normalization is one of three methods by which a public utility can compute depreciation. Under normalization, utilities use liberalized depreciation methods in calculating their federal income taxes, but compute their cost of service, which includes federal income taxes, as if they were using straight-line depreciation. The difference between these two tax amounts must be placed in a deferred tax reserve account. *See* 26 U.S.C. § 167(*l*)(3)(G), cited *infra* at n. 37.

The second method is flow-through. Here utilities use liberalized depreciation both for tax and ratemaking purposes. Hence current consumers receive the benefit of current accelerated depreciation deductions via lower rates. The third method, straight-line depreciation, requires the utility to use the straight-line depreciation method for both tax and rate purposes. *See generally* FPC v. Memphis Light, Gas & Water Division, 411 U.S. at 460, 93 S.Ct. at 1723.

12. Non-expansion property includes all pre-1970 property and any post-1969 property which does not increase the productive or operational capacity of the taxpayer. The term "non-expansion property" is used to apply to both pre-1970 and post-1969 property. "Replacement property" is post-1969 non-expansion property only. *See* 26 U.S.C. § 167(*l*)(4).

13. Expansion property is post-1969 property which increases the productive or operational capacity of the taxpayer. *See id.*

presumption of validity accorded the FPC:

> Section 19(b) of the Natural Gas Act provides without qualification that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." More important, we have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, at 228, 88 L.Ed. 333 (1944). We are not obliged to examine each detail of the Commission's decision; if the "total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." *Ibid.*[14]

This general principle of deference has been carried over to the particular area of depreciation for ratemaking purposes. Prior to 1966 the various circuit courts acceded to the FPC view [15] that liberalized depreciation provided only a tax deferral and not a tax savings.[16] Hence companies were allowed to take liberalized depreciation for tax purposes but to normalize for ratemaking purposes, to ensure that current consumers would pay their fair share and not burden future consumers. However, when in 1966 the FPC completely changed its view and concluded that liberalized depreciation would result in a permanent tax saving where there was a growing or stable plant, the courts applauded the FPC's flexibility and affirmed the requirement that companies flow-through the tax savings to current consumers.[17] Given the traditional wide discretion of the FPC, petitioners must meet a heavy burden to sustain their challenge.[18]

### B.

The portion of the FPC order challenged here is the approval of Texas Gas' abandonment of flow-through for accounting and ratemaking purposes. This decision, which represents a change from the position of the FPC in *Alabama-Tennessee Natural Gas Co.*,[19] was based on the FPC's determination that, given the current situation in the gas industry and the particular facts as to Texas Gas, Texas Gas would no longer obtain a tax savings from the use of liberalized depreciation on pre-1970 and post-1969 non-expansion property.

14. Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed. 312 (1968).

15. The FPC view was enunciated in Amere Gas Utilities Co., 15 F.P.C. 760 (1956).

16. *See, e. g.,* Cities of Lexington et al. v. FPC, 295 F.2d 109, 114 (4th Cir. 1961) ; El Paso Natural Gas Co. v. FPC, 281 F.2d 567, 573-574 (5th Cir. 1960), cert. denied sub nom. California v. FPC, 366 U.S. 912, 81 S.Ct. 1083, 6 L.Ed.2d 236 (1961). *Cf.* Panhandle Eastern Pipe Line Co. v. FPC, 115 U.S.App.D.C. 8, 316 F.2d 659 (en banc), cert. denied, 375 U.S. 881, 84 S.Ct. 147, 11 L.Ed.2d 111 (1963).

17. Alabama-Tennessee Natural Gas Co., 31 F.P.C. 208 (1964), aff'd, 359 F.2d 318 (5th Cir.), cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). *See also* City of Chicago v. FPC, 128 U.S.App.D.C. 107, 385 F.

2d 629 (1967), cert. denied sub nom. P.S.C. of Wisconsin v. FPC, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

18. The Supreme Court reaffirmed the traditional principle in *Memphis Light*:

> [T]here is no indication in the legislative history of this tax measure that Congress desired to modify, as respects the precise issue involved here, the broad discretion of the Commission delineated in *Hope Natural Gas* and in other rate cases.
>
> \*     \*     \*     \*     \*
>
> The lower Courts have allowed the Commission broad discretion in determining proper depreciation methods for ratemaking purposes.

411 U.S. at 466, 467, 93 S.Ct. at 1728.

19. 31 F.P.C. 208 (1964), aff'd, 359 F.2d 318 (5th Cir.), cert. denied, 385 U.S. 847, 87 L. Ed. 69, 17 L.Ed.2d 78 (1966).

In capsule form, the FPC analysis proceeded as follows:

(a) Because of Texas Gas' election under the Tax Reform Act, depreciation on post-1969 expansion property would be subject to normalization, not flow-through.[20]

(b) Therefore, tax depreciation on post-1969 expansion property would not be available to offset declining tax depreciation on other, older property.

(c) Excluding such expansion property, the continued use of liberalized depreciation on non-expansion property would not create a tax saving; there would not be a stable basis of tax depreciation because the permissible tax depreciation life of natural gas property is much shorter than the actual physical life.

(d) It follows that normalization for ratemaking purposes will provide a greater potential for stable rates for consumers, and a better chance for the company to earn a fair rate of return without future rate increases.

(e) Additionally, normalization will improve the company's before tax coverage of interest, thus improving the company's securities, and will also help alleviate current shortages of cash.

■ Petitioners attack several steps in this rationale as lacking substantial evidence, and indeed as lacking any evidence whatever. We find the objections unpersuasive and affirm the decision of the FPC as based on substantial evidence. Not only do we find evidence supporting the FPC, but much of this evidence is uncontradicted in the record, briefs, and oral argument.

## C.

*First*, we find that there is sufficient evidentiary support for the FPC determination that the pre-1970 plant will not remain stable, in the sense that the basis of tax depreciation will decline.[21] Contrary to Memphis Light's assertion that there is no relevant evidence,[22] a senior vice-president of Texas Gas testified at the hearings that tax depreciation on the existing plant would fall by $1.1 million between 1970 and 1971.[23]

---

20. This action was pursuant to the general FPC policy announced in Order No. 404, 43 F.P.C. 740, rehearing denied, 44 F.P.C. 16 (1970). This court affirmed that order in our previous consideration of the case at bar, 149 U.S.App.D.C. 238, 250, 462 F.2d 853, 865 (1972), and that part of our decision was not brought to the Supreme Court in *Memphis Light. See* 411 U.S. 458, 463 n. 9, 93 S.Ct. 1723, 1727, n. 9, 36 L.Ed.2d 426.

21. "Excluding new expansion facilities from consideration, the continued use of liberalized depreciation on the pre-1970 plant will not create a tax saving. It is not an answer to urge that the allowable tax depreciation of the pipeline plant remaining after exclusion of the post-1969 expansion facilities will be sufficiently stable to avoid forever repayment of taxes earlier avoided by liberalized depreciation. This is because the permissible tax depreciation life of natural gas properties is much shorter than the physical life of such properties. In other words, the period of time over which the properties would be useful and depreciable for tax purposes is dependent on the gas supply rather than the useful physical life of the plant. It therefore follows that the pre-1970 tax plant will not be a stable plant in the sense that plant retirements are replaced by new facilities, but the basis of tax depreciation related thereto will decline, so that there is little chance with respect to this plant that there will be any permanent tax savings. Under these circumstances, therefore, Texas Gas is correct in contending that normalization in computing the tax allowance for rate purposes with respect to its pre-1970 facilities offers more hope for stability of rates for its customers and more assurance that the company can earn its fair rate of return without future rate increases. Further benefits of normalization are that it will improve the company's before tax coverage of interest, thereby enhancing the quality of its securities, and that it will help alleviate present day cash shortages." 43 F.P.C. at 829-30, App. at 108-09.

22. The Supplemental Brief for Memphis Light at 7 states:
   This is the finding for which there is no evidentiary support. There is nothing in the record on the stability of Texas Gas' pre-1970 plant, nothing on plant retirements, nothing on replacement facilities.

23. Testimony of Senior Vice-President Meythaler, App. at 17-18.

Investment of $33 million in new plant would be necessary to maintain the same dollar differential between tax and book depreciation. Thus, if annual replacement investment were less than $33 million, the amount of tax depreciation on the pre-1970 plant would decline, and liberalized depreciation would no longer produce a tax saving [24] which could be passed on to the consumer in the form of lower current rates.

The FPC looked to the annual reports of Texas Gas previously filed with the agency, and determined that annual plant retirements from 1965 to 1969 averaged $2.7 million, valued at original cost.[25] While Memphis Light is technically correct that this evidence was not in the record as such, nevertheless courts have traditionally permitted the FPC to go to materials such as filed company reports which are dehors the record.[26] Hence, there are adequate grounds for the FPC to conclude that it is unlikely that replacement investment will be sufficient to maintain a stable plant,[27] in the sense that the basis of tax depreciation related thereto will decline. We believe that this evidence meets the requirements set forth long ago by Chief Justice Hughes, that substantial evidence be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [28] Although a reviewing court might prefer more evidence in the record as the basis for the FPC decision, we cannot say that there is not substantial evidence behind the FPC order and opinion.

In reaching the conclusion that the continued use of liberalized depreciation on the pre-1970 plant will not produce a tax saving, the FPC stated that the gas supply was an important factor in determining the depreciable life for tax purposes.[29] Memphis Light contends that there is no evidence to support the FPC's statement that the tax depreciation life of Texas Gas' natural gas properties "is dependent on the gas supply rather than the useful physical life of the plant," and that there is no evidence that the gas supply is a limiting factor for Texas Gas.[30] Again we find that there is evidence both in the record and in sources suitable for official notice which form a sufficient basis for the FPC's conclusion. The chief executive officer of Texas Gas testified at the hearings that the entire industry faces a serious shortage of natural gas;[31] other testimony indicated that Texas Gas did not foresee rapid growth in the future.[32] On a more general level, the

24. Public Service contends in its Supplemental Brief at 18 that these figures are irrelevant. We disagree. Furthermore, Public Service seems to have completely misinterpreted the import of the figures, for it incorrectly states that the FPC said that the increase in taxes would be $33 million in 1971.

25. See Supplemental Brief for FPC at 11.

26. See Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d at 336–339. There the Fifth Circuit approved the FPC's use of materials such as the forms here used, and other statistics and forecasts, to support its findings on tax savings resulting from liberalized depreciation. Cf. NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) ; NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 348–349, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

27. Treasury Regulation 1.167(l)–4(c) characterizes as replacement investment the dollar amount equal to plant retirements in a given year valued at original cost.

We do not decide here whether this Treasury Regulation utilized by the FPC to characterize part of Texas Gas' new investment as replacement investment is valid. All we do decide is that there is substantial evidence on which the FPC could conclude that replacement would not be sufficient to parlay liberalized depreciation on pre-1970 plant into a tax saving.

28. Consolidated Edison Co. v. NLRB, 305 U. S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

29. 43 F.P.C. at 829, App. at 108.

30. Supplemental Brief for Memphis Light at 9.

31. Testimony of Texas Gas Chief Executive Elmer, App. at 4.

32. Testimony of Texas Gas Senior Vice-President Meythaler, App. at 18. We note that Mr. Meythaler did not say that there

serious natural gas shortage has been recognized by the Supreme Court [33] and by various FPC publications.[34] The dependence of tax depreciation life on the gas supply has been frequently acknowledged by the FPC[35]

These factors combined to cause the FPC to recognize that the conditions which earlier had led to the requirement of flow-through were no longer applicable to a company such as Texas Gas. It was highly improbable that Texas Gas would make sufficient replacements in its pre-1970 plant to cause liberalized depreciation to result in a tax saving [36] to be passed on to the consumer in the form of lower current rates.

*Second,* we believe that the FPC's determination that the benefits of liberalized depreciation on post-1969 expansion property will not be available to offset decreased depreciation on pre-1970 and replacement property is adequately supported by evidence and logic. The FPC rests this conclusion on the election made by Texas Gas pursuant to the Tax Reform Act to abandon flow-through

and to normalize with respect to post-1969 expansion property. Under this normalization method, Texas Gas is to pay taxes based on liberalized depreciation on the post-1969 expansion property but to charge rates based on straight-line depreciation. The difference between the straight-line and liberalized depreciation is to be placed in a reserve account.

Petitioners contend that the funds in the reserve account established pursuant to the Tax Reform Act [37] are not earmarked for the specific property which generated the deferral in taxes, but instead can be used against both expansion and non-expansion property.[38] Under this theory the change in depreciation methods would not affect utility rates for several years. However, we believe this interpretation of the election is at odds with the intent of Congress in the Tax Reform Act. Comments in the House, Senate, and Conference Reports all suggest that a reserve is to be established "for future tax liability," [39] *i. e.,* as an offset of declining depreciation on

would be zero growth, but only that the growth picture would not be "as rosy" as previously. The FPC recognized that there would be some growth in the future. 43 F. P.C. at 831, App. at 110.

33. FPC v. Louisiana Power & Light Co., 406 U.S. 621, 626, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

34. *See, e. g.,* FPC Staff Report No. 2, National Gas Supply and Demand 1971–1990 (1972), *quoted in* FPC v. Louisiana Power & Light Co., 406 U.S. at 626 n. 2, 92 S.Ct. 1827 at 1831 n. 2.

35. *See, e. g.,* City of Detroit v. Panhandle Eastern Pipe Line Co., 3 F.P.C. 273, 282 (1942), aff'd sub nom. Panhandle Eastern Pipe Line Co. v. FPC, 143 F.2d 488 (8th Cir. 1944), aff'd, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241 (1945) ; United Carbon Co., 25 F.P.C. 181, 184–86 (1961) ; Olin Gas Transmission Corp., 17 F.P.C. 685, 688–90 (1956).

36. Such educated predictions of trends are often a necessary part of the FPC's decision-making process. *See* Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d at 339.

37. 26 U.S.C. § 167 (*l*) (3) (G) provides,
Normalization method of accounting.—In order to use a normalization method of accounting with respect to any public utility property—
(i) the taxpayer must use the same method of depreciation to compute both its tax expense and its depreciation expense for purposes of establishing its cost of service for ratemaking purposes and for reflecting operating results in its regulated books of account, and
(ii) if, to compute its allowance for depreciation under this section, it uses a method of depreciation other than the method it used for the purposes described in clause (i), the taxpayer must make adjustments to a reserve to reflect the deferral of taxes resulting from the use of such different methods of depreciation.

38. *See* Supplemental Brief for Memphis Light at 10–14, Supplemental Brief for Public Service at 16–17.

39. H.R.Rep.No.413, 91st Cong., 1st Sess., pt. 1, at 132 (1969), provides that normalization involves
computing the greater Federal income tax liability that would have resulted from use of straight line depreciation and adding

the same post-1969 property in later years. It is true, as Memphis Light urges, that the Congress was not concerned that the funds be kept in a specific named account; the Congress simply required that the funds be set aside in some reserve account, with any nomenclature.[40] This reserve is an asset of the company and can be used for a restricted variety of purposes.[41] However, if the reserve were dissipated by being used against the declining depreciation on non-expansion property, the purpose of normalization on post-1969 expansion property would be defeated.

Public Service further suggests that it is incorrect to evaluate the depreciation reserve fund on post-1969 expansion property separate from the totality of depreciation on all property.[42] However, the fact that depreciation is to be taken on property as a whole does not alter the fact that pursuant to the election under the Tax Reform Act Texas Gas must add to a reserve on its books amounts attributable to the difference between liberalized and straight-line depreciation on post-1969 expansion property.

■ Memphis Light additionally urges that the election under the Tax Reform Act could have no effect until after the test years involved here.

Memphis Light suggests that there is no evidence that Texas Gas has in fact acquired any expansion property.[43] These claims are of little import. The FPC may always consider a test year's data in the light of the predictable future situation.[44] The fact that there may have been no expansion property merely produces the same result as a separation of depreciation on expansion property from other property, i. e., there is no depreciation on the former available to offset declines in depreciation on the latter.

*Third*, Memphis Light challenges a subsidiary statement of the FPC, that, as compared with flow-through, normalization will offer "more hope for stability of rates for its customers." [45] According to Memphis Light, there is no evidence to support this statement.[46] However, a perusal of the record indicates that a vice-president of Texas Gas explicitly stated that normalization would provide "a little more chance of stability of rates" [47] than flow-through. He further stated that, "Under straight-line depreciation, there would be greater stability of rates for the customers and more assurance that the company could earn its fair rate of return without an increase in rates." [48]

this amount to a reserve account for future tax liability on the regulated utility's books of account.

40. *See* Staff of Joint Comm. on Internal Revenue Taxation, 91st Cong., 1st Sess., General Explanation of the Tax Reform Act of 1969, at 152 (Comm.Print 1969), which notes,

In some jurisdictions the purpose and effect of normalizing is accomplished by additions to a reserve for depreciation. The Act permits such a definition of normalization and does not require that additions be to a separate account described as a "reserve for deferred taxes."

41. See the description of the reserve account, known as FPC Account 282, in 18 C.F.R. Part 201, § 282. The comments in the Senate and Conference Reports provide further elaboration. The Senate Report describes normalization as involving "the utility retaining the current tax reduction and using this money in lieu of capital that would otherwise have to be obtained from equity invest-

ments or borrowing." S.Rep.No.552, 91st Cong., 1st Sess. 171 (1969). The Conference Report defines the term normalization in identical language to the Senate Report. *See* H.R.Rep.No.782, 91st Cong., 1st Sess. 312 (1969).

42. *See* Supplemental Brief for Public Service at 14–16.

43. Supplemental Brief for Memphis Light at 10.

44. *See* note 36 *supra*.

45. FPC Opinion No. 578, 43 F.P.C. at 830, App. at 109.

46. Supplemental Brief for Memphis Light at 9.

47. Cross-examination of witness Meythaler, App. at 34–35.

48. Rebuttal testimony of witness Meythaler, App. at 29.

He then went on to point out specific differences in the ability of the company to absorb costs under the straight-line and flow-through methods.[49]

In addition to this testimony, there is the logical fact that normalization causes current consumers to pay their fair share of tax costs attributable to depreciation, so that future consumers will not be forced to pay higher tax costs when the basis for depreciation declines. Normalization effects a stabilization in rates between present and future consumers, insofar as rates reflect depreciation.

*Fourth,* Memphis Light contends that there is no evidentiary support for the FPC's conclusion that normalization would produce an enhancement of the quality of Texas Gas' securities, by improving the company's before tax coverage of interest.[50] Again, there is a clear statement in the record by the vice-president of Texas Gas that the quality of securities would be lower if liberalized depreciation with flow-through were continued than if straight-line depreciation were utilized, because of differences in the before tax interest coverage.[51] This witness' testimony was cross-examined.[52] No contradictory information was introduced. We conclude that this relatively subordinate finding of the FPC was based on substantial evidence.

### III. Notice of Normalization as an Alternative

Memphis Light contends that it was not put on notice that normalization would be considered until twelve days before the FPC opinion issued, which was well after the filing of briefs and the closing of the record.[53] We are not persuaded that this is a ground for reversal or even a remand to the FPC because there has been no suggestion of prejudice to anyone by this lack of notice.

The theory behind Memphis Light's objection apparently is that since the initial pleadings and evidence of Texas Gas only concerned the possibility of shifting from flow-through to straight-line depreciation, the parties such as Memphis Light did not have notice of the possibility that the FPC might allow normalization, as it in fact did. It is true that there was no formal notice that normalization would be considered; there were only two instances where normalization was explicitly suggested: (1) in the initial brief of an intervenor,[54] and (2) in a letter filed by Texas Gas twelve days before the actual FPC opinion.[55] However, some testimony before the hearing examiner did relate to normalization.[56]

■ Whether the notice amounts to sufficient notice or not, we need not here decide. Even if the notice were inadequate, such lack of knowledge would be significant only if the parties would have taken a *different approach* or presented *different evidence* than they did when they were merely opposing the adoption of straight-line by Texas Gas. But Memphis Light has given no hint as to the possible existence of any evidence, which Memphis Light rationally would offer to defeat normalization, but which it would not also present to defeat straight-line.

The FPC considered this problem of proper notice concerning normalization in its Opinion Denying Rehearing. It felt that normalization was simply another solution of the problem, preferable to straight-line:

Normalization, as our opinion indicates, would improve the company's

---

49. *Id.* at 29–30.

50. Supplemental Brief for Memphis Light at 9.

51. Testimony of witness Meythaler, App. at 15–17.

52. Cross-examination of witness Meythaler, App. at 37–40.

53. Supplemental Brief for Memphis Light at 8.

54. Memorandum Initial Brief for Western Kentucky Gas Co., App. at 83–84.

55. App. at 98.

56. *See* App. at 28–29, 34–35.

cash position, would, in effect, provide it with an interest free fund, and, because of the deduction of the accumulated reserves in Account 282 from the rate base, would reduce the company's cost of service and benefit consumers. This is a solution which we find *more in the public interest than reversion to straight-line depreciation* . . . .[57]

Since the FPC could have granted Texas Gas the opportunity to change to straight-line, it certainly could adopt what it viewed as an approach more favorable to the public consumer.

The FPC analysis is correct, unless there is some evidence that is rational to introduce in normalization hearings but not rational to introduce in straight-line hearings. If there is such evidence, the parties have not so notified this court in briefs or oral argument. Furthermore, the petitioners have not demonstrated that some harm might result from normalization which would be different from harm resulting from straight-line depreciation, the proposed change of which there was all due notice. Lacking any such indication of differences in approach, evidence, or harm, this court cannot label as unfair or improper the FPC's adoption of normalization in a proceeding initially brought to effect a change to straight-line.[58]

## IV. *Conclusion*

■ We believe that the FPC has complied with the applicable statutory and judicial requirements. The FPC was justified in allowing Texas Gas to change from flow-through to normalization, given the circumstances involved.[59]

■ We find no conflict between the rate increase allowed Texas Gas and the "actual expenditures theory," by which rates of utilities are supposed to reflect actual payments.[60] For while Texas Gas is not currently paying taxes at straight-line rates, it is incurring the liability now to pay increased taxes in the future. Such a method as normalization, whereby current consumers are prevented from forcing future consumers to pay their deferred taxes, does not amount to causing an increase of rates based on fictitious taxes.[61] And the Supreme Court specifically noted in its opinion in this case that normalization was permissible even though it might result in an increase in rates.[62]

The result reached in this case conforms to the standard recently reaffirmed by the Supreme Court,

[R]ates are "just and reasonable" only if consumer interests are protected and if the financial health of the pipeline in our economic system remains strong.[63]

Affirmed.

---

57. FPC Opinion No. 578–A, 44 F.P.C. at 142, App. at 147 (emphasis supplied).

58. Public Service contends in its Supplemental Brief at 24–28 that even if the notice were sufficient, it was improper to consider the treatment of depreciation separate from the appropriate rate of return. We disagree. The whole thrust of the FPC analysis of depreciation is whether a tax saving is no longer available and at most a tax deferral possible; this is properly separable from general rate of return questions.

59. However, we must state that we cannot applaud the FPC's heavy reliance on material outside the record. It would be prefera-

ble if the FPC could insure expression on the record of a broad range of views.

60. *See, e. g.,* FPC v. United Gas Pipe Line Co., 386 U.S. 237, 245, 87 S.Ct. 1003, 18 L. Ed.2d 18 (1967).

61. If normalization were interpreted to have such an effect as suggested by petitioners, it would always violate the actual taxes paid principle.

62. 411 U.S. at 472–473, 93 S.Ct. 1723.

63. *Id.* at 474, 93 S.Ct. at 1732, *citing to* FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).