606 F.2d 973
 196 U.S.App.D.C. 66
 PUBLIC SYSTEMS et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Commonwealth Edison
Co., New EnglandPower Co. et al., Southern
California Edison Company, Consumers
Power Company, Tennessee Gas
Pipeline Co., Intervenors.
PUBLIC SYSTEMS et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Investor-owned Utility Companies, Consumers Power Company,
Tennessee GasPipeline Co., Intervenors.
 Nos. 76-1609, 76-1830.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 18, 1977.
Decided Feb. 16, 1979.
Rehearing Denied March 30, 1979.
 
 Petitions for Review of Orders of the Federal Energy Regulatory commission.
 James N. Horwood, Washington, D. C., for petitioners. Robert C. McDiarmid, Robert A. Jablon, Daniel I. Davidson, and Bonnie S. Blair, Washington, D. C., were on the brief, for petitioners.
 Dennis Lane, Atty., Federal Energy Regulatory Commission, for respondent. Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Sol., Washington, D. C. and Danny J. Boggs, Bowling Green, Ky., Atty., Federal Energy Regulatory Commission, were on the brief, for respondent.
 
 
 1
 James B. Liberman, Washington, D. C., with whom Frederick T. Searls and Leonard W. Belter, Washington, D. C., were on the brief, for intervenor New England Power Co., et al. Mr. Liberman argued for all intervenors.
 
 
 2
 Joseph C. Swidler, Washington, D. C., was on the brief, for intervenor Commonwealth Edison Co. in No. 76-1609.
 
 
 3
 George A. Avery and Keith S. Watson, Washington, D. C., were on the brief, for intervenor Consumers Power Co.
 
 
 4
 Melvin Richter and Terence J. Collins, Washington, D. C., entered appearances for intervenor Tennessee Gas Pipeline Co.
 
 
 5
 Before WRIGHT, Chief Judge, BAZELON and ROBB, Circuit Judges.
 
 
 6
 Opinion for the Court filed by BAZELON, Circuit Judge.
 
 
 7
 Dissenting opinion filed by ROBB, Circuit Judge.
 
 BAZELON, Circuit Judge:
 
 8
 Petitioners, municipally-owned utilities, challenge a rule promulgated by the Federal Power Commission (FPC) permitting "comprehensive interperiod tax allocation" (CITA) for interstate suppliers of gas and electricity. The rule allows suppliers to "normalize" an unspecified number of tax benefits,[1] a process that permits the utilities to defer tax payments but include the deferred costs in current rates. Petitioners, who buy power wholesale and distribute it locally, allege that the Commission failed to provide a reasoned basis for its action and improperly neglected the anticompetitive consequences of its new policy. We agree and remand for further proceedings.[2]
 
 I.
 
 9
 The dispute over normalization versus "flow-through" of tax benefits arises when utilities have the opportunity to defer current tax liabilities. Under normalization, a utility receives the benefit of the tax deferral but charges rates as though the postponed taxes had been paid. The difference between the taxes actually paid and the larger amount charged to ratepayers is ordinarily retained in a "deferred tax" account. Until the deferred taxes fall due, the funds "are available to the company as working capital free of any charges for interest or dividends."[3] Without normalization, intervenors claim, utilities may have to raise future rates to pay the deferred liability, thus shifting expenses incurred by current consumers to future ratepayers.
 
 
 10
 Advocates of flow-through, however, contend that under normalization the consumer pays "phantom" taxes. Unless tax benefits are passed on to the taxpayer, the argument goes, the utility will reap a permanent tax saving, since so long as the expenses subject to normalization remain stable or increase, the benefits of postponing present tax liabilities will more than offset previously deferred taxes that currently fall due.[4] This proposition is strengthened in periods of inflation, when current liabilities will likely exceed previously deferred expenses.[5]
 
 
 11
 The question of normalization versus flow-through first arose before the Commission following the 1954 enactment of § 167 of the Internal Revenue Code, permitting the use of accelerated depreciation for tax purposes.[6] The Commission, emphasizing the congressional goal of encouraging industrial expansion, initially let utilities normalize the benefits of rapid depreciation.[7] In the 1960s, however, the FPC decided that the power industry would expand faster in response to increased consumer demand resulting from lower prices, so it forced the utilities to include in rates only taxes actually paid.[8] The Fifth Circuit, noting that utilities should not be able to win a permanent tax saving through normalization, upheld the adoption of flow-through as a justifiable exercise of the Commission's discretionary authority.[9]
 
 
 12
 The Tax Reform Act of 1969 partially reversed Commission policy. It allowed a utility to use accelerated depreciation on property acquired after 1969 while charging higher rates to cover the tax expenses that would result from straightline depreciation.[10] Faced with changing economic conditions in the industry notably, a reported shortage of natural gas, and of energy generally the Commission extended normalization to utility property acquired before 1970. The Supreme Court upheld the agency's third policy change in this area in twenty years, stressing the Commission's broad responsibility to regulate in the public interest.[11]
 
 II.
 
 13
 The instant case, a rulemaking proceeding begun in 1971, is the most recent episode in the ongoing saga of normalization versus flow-through. After receiving public comments, the agency issued Order No. 530 on June 18, 1975, announcing a "general policy" in favor of permitting CITA following "appropriate factual showings" in individual rate proceedings.[12] The Commission offered seven examples of tax payments covered by its order,[13] noting that "changed circumstances" required the extension of normalization.
 
 
 14
 The situation has changed from a period where gas consumption was encouraged to a period of curtailment, and from a period when raising capital was not a problem to a period when pipelines face serious problems in generating and attracting needed capital.
 
 
 15
 The electric industry today shares many of the problems of the natural gas industry.[14]
 
 
 16
 Greater use of normalization, the agency said, would improve the regulated firms' cash flow and reduce their need for external financing.
 
 
 17
 In response to petitioners' request for rehearing, the Commission modified its rule in Order 530-A, on January 19, 1976. The new order attempted to define the "appropriate factual showings" needed to qualify for CITA. The Commission said that a utility seeking normalization would have to demonstrate that CITA would result in only a tax deferral, not a permanent tax saving. Cash flow needs would be relevant to such a showing, but normalization would not be permitted without proof that no tax saving would result.[15] Although the FPC agreed with petitioners that economic conditions had improved for utilities, it reiterated its "general findings of the need for increased cash flow for utilities."[16] Petitioners' claim that normalization might adversely affect competition was left for case-by-case resolution.[17]
 
 
 18
 Again the FPC granted rehearing, this time at the request of a group of utilities, and on July 6, 1976, the Commission issued Order 530-B, rejecting the tax saving/tax deferral distinction and adopting a general policy of permitting normalization. The Commission proclaimed that normalization would be acceptable so long as it involved only "timing differences rather than . . . permanent differences between book and tax treatment."[18] It reviewed each of the seven examples of tax benefits explicitly covered by its order, and concluded that there was no basis for predicting that tax savings would arise from normalization.[19] And in denying petitioners' request for yet another rehearing for consideration of the tax saving and competition issues,[20] the Commission again prescribed case-by-case handling of competition problems. Surprisingly, however, the agency abandoned its previous insistence that normalization was needed to protect the industry's financial health. Citing an opinion of the American Institute of Certified Public Accountants, the Commission held normalization "the proper and preferable method for ratemaking and accounting purposes."[21]
 
 III.
 
 19
 Petitioners say that the Commission improperly discarded the distinction between tax deferral and tax saving in its final orders.[22] They urge that the possibility of a permanent tax saving through normalization, recognized by many courts,[23] violates the basic tenet of rate regulation that a utility is entitled to earn its cost of service plus an adequate rate of return.[24]
 
 
 20
 Until now, normalization has been upheld when there was at least a very low probability of tax saving.[25] A rule favoring normalization would reverse the presumptions in rate hearings. Rather than require a demonstration that normalization will generate only a tax deferral, Order 530-B would require a showing that a saving would occur in order to bar CITA. Such proof would have to overcome the Commission's statement that the seven examples discussed in Order 530-B do not involve possible tax savings, but "represent items for which there is only a timing difference."[26] This pro-normalization policy must comport with the spirit of federal utility regulation by ensuring that consumers at least will suffer no detriment under CITA.[27]
 
 
 21
 That this case presents a Rule, announced in an Order, with direct impact on ratemaking, raises questions about the proper standard of review. We will proceed under § 19(b) of the Natural Gas Act, which prescribes a " substantial evidence" standard for findings of fact in orders.[28] Courts initially restricted § 19(b) to appeals of adjudications,[29] but we think the statute's language does not support the distinction between orders derived from adjudications and those growing out of rulemaking. As one court has observed, the Natural Gas Act "refers more or less indiscriminately to 'rules,' 'regulations,' and 'orders.' " Union Oil Co. v. FPC, 542 F.2d 1036, 1040 (9th Cir. 1976). Our course is supported by the Commission's frequent practice of acting by order, without classifying a proceeding as either rulemaking or adjudication.[30]
 
 
 22
 In response to these considerations, this court began to review FPC rulemaking under § 19(b) so long as (1) the rule had a direct and immediate effect on the appellants, and (2) there was a sufficient evidentiary record to permit review by an appellate court.[31] The second leg of this standard can raise problems, however, because the record produced in notice and comment rulemaking frequently lacks designated factual findings. As a result, it becomes crucial that the Commission's order include a reasoned opinion detailing those factual elements in the record that underlie the Commission's actions.[32] Our review, as set forth in Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968), must determine "whether each of the order's essential elements is supported by substantial evidence."[33] Of course, to the extent that a rule represents a policy decision without direct factual reference, our review also requires that the Commission action be the product of reasoned decisionmaking.[34]
 
 IV.
 
 23
 Although the initial orders in this proceeding relied on factual findings of economic conditions in the power industry, the orders now before us rest on general policy considerations.[35] Consequently, in § 19(b) review of rulemaking, the court must "assure itself that the Commission has given reasoned consideration to each of the pertinent factors."[36] Our limited review function can be effective "only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry."[37] We find the FPC orders before us fail to (1) assess the consequences of its action for the industry, and (2) indicate "fully and carefully" the purposes behind the order.
 
 
 24
 The orders provide no indication of the impact on consumers or utilities of adopting CITA. Not only is there no statement as to the financial resources at issue in the pro 196 U.S.App.D.C. 74>>ceeding,[38] but the orders also fail to specify all the expenses that would be covered by CITA, offering instead seven examples without further explanation. Of course, precise quantification of all elements of proposed Commission action is not required. Still, some indication that the agency has gauged the likely effects of its course is essential.[39]
 
 
 25
 Moreover, the discussion of the seven examples in Order 530-B is incomplete. The order first deals with the normalization of pension costs, taxes, and other expenses incurred during plant construction, all of which can be deducted from current taxes. The order finds normalization "especially appropriate" in these instances, which are, in financial terms, the most significant categories covered by the order. "(I)n any year in which plant construction slackens," the Commission claims, "a company's deferred taxes amortized could exceed its new deferrals." J.A. 851. But there is nothing in the order to support this implicit conclusion that fluctuation in construction activity will prevent utilities from gaining a tax saving. Indeed, the protracted nature of the large-scale construction projects that characterize the power industry suggests that fluctuations in building activity may not be very great. In addition, if the Commission correctly based Orders 530 and 530-A on its view that both the natural gas and electric industries must expand, then the conditions for a tax saving, rather than a mere deferral, may be present if construction-related tax benefits are normalized.
 
 
 26
 The other, less significant, examples cited in Order 530-B receive summary treatment. We do not pass on the accuracy of the agency's assessment that there is little danger of a tax saving with respect to these items, because there is insufficient explanation of the Commission's position for effective review.
 
 
 27
 Perhaps more notable than the inadequacy of the Commission's estimate of the impact of CITA is the failure to explain the goals of its policy. Order 530-B states only that the purpose of the Commission's action is to reduce uncertainty about utility revenues so the utilities will be better able to attract capital, "with resultant lower costs to consumers"; that both utilities and consumers will benefit from easier financial planning under a blanket rule in favor of normalization; and that rate cases should be shortened.[40] This statement will not hold. These virtues attributed to the general rule of normalization are characteristics of Any general rule. And, by the terms of the Commission's discussion, a blanket policy in favor of flow-through would generate equivalent benefits.[41]
 
 
 28
 The sole remaining basis for the Commission's action is its naked assertion in the Order Denying Rehearing that normalization is "the proper and preferable method for ratemaking and accounting purposes."[42] As the Supreme Court has observed, "generalities do not supply the requisite clarity" to permit a reviewing court to sustain an FPC order.[43] Although we are bound to respect agency expertise when reasonably exercised, we cannot rely on bland assurances that a policy is, indeed, to be preferred. This is particularly true where, as here, questions are raised as to the congruence of that policy with broad statutory goals. Moreover, despite the obvious relevance of accounting precepts for some regulatory policies, they cannot supply an independent basis for action when they may conflict with established ratemaking principles.[44]
 
 V.
 
 29
 Petitioners also allege that Order 530-B may have serious anticompetitive impact in states that require flow-through of deferred tax benefits. Wholesalers in such states could be subject to a "price squeeze": they might have to pay the deferred taxes to interstate suppliers while state regulators would require that such benefits be flowed through in retail rates. We remand to the Commission for further action on this issue as well.[45]
 
 
 30
 On numerous occasions the Supreme Court has recognized both the importance of competition in regulated industries and the responsibility of regulatory agencies to encourage competitive forces.[46] The FPC has been required to examine the impact on competition of ratemaking orders,[47] the issuance of utility securities,[48] and industry supply practices.[49] The price squeeze question raised by petitioners parallels the issue confronted in FPC v. Conway Corp., 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), where it was alleged that by increasing wholesale prices, an interstate supplier would squeeze wholesalers with whom it also competed at the retail level. The Court instructed the Commission to consider the relationship between its own rates for interstate power sales and state rate schedules. Id. at 280, 96 S.Ct. 1999.
 
 
 31
 The question before us is whether the Commission's determination to review the price squeeze issue on a case-by-case basis was reasoned decisionmaking. In Order 530-A, the Commission resolved, without further discussion, to consider this contention only in particular cases.[50] The Commission discussed the issue in one paragraph in the Order Denying Rehearing of Order 530-B. First, relying on its finding that normalization would bring only timing differences in tax payments, the agency denied that it had to consider the price squeeze problem at all. J.A. 877. The order, however, then counselled petitioners that a price squeeze might not "necessarily" occur under normalization, and concluded that the issue would be dealt with best in specific cases. There may be good cause for the view that price squeeze situations will not result from adoption of CITA, or that case-by-case treatment, rather than review in a rulemaking proceeding, would be a superior administrative method for handling the problem. Unfortunately, such rationales cannot be found in the Commission's glancing treatment of the matter.
 
 
 32
 Consequently, the orders are remanded to the Commission for further action not inconsistent with this opinion.
 
 
 33
 So ordered.
 
 ROBB, Circuit Judge, dissenting:
 
 34
 I cannot agree with the majority that the substantial evidence standard of review should be applied to these orders of the Federal Power Commission. Moreover, I believe the orders should be upheld as rational exercises of the Commission's rulemaking power under the appropriate standard of review, that is, was the Commission's action arbitrary or capricious? Accordingly, I dissent.
 
 
 35
 The Commission has twice before considered the issue of normalization as against flow-through. It concluded once that normalization was the preferable policy, and was upheld on a later appeal. See Amere Gas Utilities, 15 F.P.C. 760 (1956); El Paso Natural Gas Co. v. FPC, 281 F.2d 567 (5th Cir. 1960). On subsequent consideration it required utilities to flow-through their tax savings to their customers, and was again upheld on appeal. See Alabama-Tennessee Natural Gas Co., 31 F.P.C. 208 (1964), Aff'd sub nom. Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d 318 (5th Cir.), Cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). Now, it has returned to a policy favoring normalization, and, for the first time, its conclusion as to which policy is preferable in light of current economic conditions has been successfully challenged.
 
 I.
 
 36
 The Commission expressed this most recent conclusion in a series of orders issued after notice-and-comment rulemaking which proceeded according to the statutory mandate of the Administrative Procedure Act (APA). Technically, the subject of these orders was a change in the Commission's Uniform Systems of Account regulations. See 18 C.F.R. Chpt. I Pt. 101. Commission activity more appropriately characterized as rulemaking, rather than adjudication, is difficult to imagine.
 
 
 37
 The APA dictates review of such informal rulemaking to determine whether it is "arbitrary, capricious, (or) an abuse of discretion." 5 U.S.C. § 706(2)(A) (1976). This standard of review should govern the action taken here, unless it is displaced by section 19(b) of the Natural Gas Act, which requires that "substantial evidence" support Commission "findings of fact." 15 U.S.C. § 717r(b) (1976). The court today imposes the substantial evidence test on informal rulemaking pursuant to the Natural Gas Act.
 
 
 38
 The court reaches its conclusion by asserting that "substantial evidence" must support the "factual predicate" on which the Commission rule is promulgated. It then invalidates the rule on the ground that it lacks adequate support in the record. To invalidate the Commission's order on this ground is, in effect, to reject the ordinary procedures of notice-and-comment rulemaking. Informal rulemaking does not necessarily involve either the creation of a record sufficient to withstand review under a substantial evidence standard or findings of the kind most susceptible to judicial review. See K. Davis, Administrative Law of the Seventies, § 29.-01-6 (1976).
 
 
 39
 The thesis of the majority is untenable in light of the Supreme Court's recent decision in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). There, addressing the imposition of procedural safeguards not mandated by statute, the Supreme Court stated:
 
 
 40
 this sort of review fundamentally misconceives the nature of the standard for judicial review of an agency rule. . . . If the agency is compelled to support the rule which it ultimately adopts with the type of record produced only after a full adjudicatory hearing, it simply will have no choice but to conduct a full adjudicatory hearing prior to promulgating every rule.
 
 
 41
 Id. at 547-48, 98 S.Ct. at 1214.
 
 
 42
 Of course, a threshold issue of reviewability arises whenever appellate examination of an agency order is sought. On the issue of reviewability the court will consider the nature of the record upon which the rule in question was promulgated. Thus, as this court has stated, "(r)ecent cases have emphasized that the 'determining factor' in connection with the reviewability of Commission orders is . . . whether the record is sufficient to allow meaningful review." American Public Gas Co. v. FPC, 178 U.S.App.D.C. 217, 220, 546 F.2d 983, 986 (1976). Although review does encompass an inquiry "into the factual predicate for the rule, i. e., the existence or non-existence of the condition advanced as the basis for the rule", Id. at 221, 546 F.2d at 987, the inquiry, as its phrasing indicates, will be satisfied by less than the substantial evidence required in a record in a formal adjudication under the APA. Nevertheless, the court today combines the jurisdictional provision of the Natural Gas Act with language in earlier opinions addressing the initial question of whether an order is reviewable at all, and imposes an obligation on the Commission to support with substantial evidence its orders issued pursuant to informal rulemaking.
 
 II.
 
 43
 The accounting rules prescribed in the Commission's orders withstand appellate scrutiny under the correct standard of review, testing only whether they are arbitrary and capricious. Although the Natural Gas Act requires that the Commission establish "just and reasonable" rates, see 15 U.S.C. § 717c(a) (1976), it allows the Commission great latitude in reaching that result. See Permian Basin Rate Cases, 390 U.S. 747, 776-77, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1967); FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1943). Here, the Commission's orders involved a rational exercise of its regulatory authority, well within its administrative discretion. I see no reason to fault the Commission's conclusion that
 
 
 44
 The adoption of normalization of income taxes for rate purposes will contribute to the health of the electric and natural gas industries by increasing cash flow and by reducing external financing requirements. In addition, normalization will contribute to the financial stability of companies and improve fixed charge coverages.
 
 
 45
 (J.A.340)
 
 
 46
 The validity and utility of the challenged accounting rules in the Commission's work of determining just and reasonable rates will only be shown in case-by-case ratemaking proceedings. Accordingly, as the Commission said in Order No. 530, it
 
 
 47
 contemplates that in each rate proceeding, where an applicant utility (electric or gas) seeks to avail itself of these normalization procedures, it shall present a factual showing appropriate to sustain its claim; and that any entity opposing the requested procedures shall present a factual showing appropriate to sustain its counterclaim. It is contemplated that these showings shall be in the nature of an obligation of coming forward with evidence to support the respective claims advanced. The Commission's ultimate findings and conclusions on these and all other questions shall reflect the substantial evidence rule of the Federal Power Act and Natural Gas Act.
 
 
 48
 (J.A.341)[1]
 
 
 49
 It is certainly not inevitable that normalization will lead to the inflation of any utility's rate base or a return to investors on capital that they did not contribute to the utility. Consequently, the imposition of a substantial evidence standard of review is premature until the results of those rate adjudications are before an appellate court. At that time, the results of the ratemaking, but not the rules under which it was conducted, must be supported by substantial evidence. "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling." FPC v. Hope Natural Gas Co., supra, 320 U.S. at 602, 64 S.Ct. at 287.
 
 
 50
 The Commission decided to defer consideration of the potential anticompetitive consequences of normalization until individual ratemaking proceedings are conducted. The majority states that this procedure lacks a rational basis. Yet even the petitioner acknowledges that the potential anticompetitive "price squeeze" to which it alludes would arise only under certain state regulatory regimes. (Pet.Br. at 53) And extreme deference is owed to the Commission in its choice of administrative procedures. See Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d 318 (5th Cir.), Cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). The Commission's decision to delay consideration of a potential problem in the coordination of state and federal regulatory programs until the program actually arises is self-explanatory, an example of administrative economy. The lack of an articulated justification for this choice of regulatory procedures is not ground for a remand unless such a decision in notice-and-comment rulemaking must be supported by substantial evidence on a record created in proceedings far more extensive than those mandated by the APA. This indirect imposition of additional procedural requirements, beyond those that the APA imposes, is not permissible. See Vermont Yankee Power Co. v. Natural Resources Defense Council, supra.
 
 CONCLUSION
 
 51
 The choice between normalization and flow-through is for the Commission. If it selects its policy in notice-and-comment rulemaking, this court's review of that choice is limited to determining whether that choice was rational. This court is not authorized to reject the Commission's reasoning because the court does not agree with it or thinks better explanations might have been made. Nor can the court substitute its policies for those of the Commission. In my opinion the record here is sufficient to show that the Commission's choice was rational. When the Commission applies its rules in ratemaking, the Commission and the court will require that substantial evidence support the results reached in those proceedings. Because the court today prematurely demands a record more elaborate than that required by the statute, I respectfully dissent.
 
 
 
 [1]
 The Commission gave seven examples of such benefits:
 (1) Regulatory commission expenses deducted when incurred for tax purposes but deferred and amortized over future periods for book purposes.
 (2) Taxes during construction deducted when incurred for tax purposes but capitalized in the cost of utility plant for book purposes.
 (3) Allowance for funds used during construction, to the extent deducted for tax purposes when expense is incurred but capitalized in the cost of utility plant for book purposes.
 (4) Differences between tax and book lives of property.
 (5) Tax deferrals arising from the use of the asset guideline class "removal cost" feature of the Revenue Act of 1971.
 (6) Tax deferrals resulting from current deduction of fuel expense for income tax purposes, but deferred over future periods for book purposes.
 (7) Tax deferrals resulting from pensions costs being deducted currently for tax purposes, but included in cost of utility plant for book purposes.
 Accounting for Premium, Discount, and Expense of Issue, Gains and Losses on Refunding and Reacquisition of Long-Term Debt, and Interperiod Allocation of Income Taxes, 53 F.P.C. 2123, 2125 (1975) (Order No. 530); J.A. 336-37.
 
 
 [2]
 The Federal Energy Regulatory Commission was created in 1977 and succeeded to the FPC's ratemaking authority under both the Federal Power Act and the Natural Gas Act. 42 U.S.C.A. §§ 7172(a)(1)(B) & (C)
 
 
 [3]
 Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d 318, 327 (5th Cir.), Cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). See 1 A. Kahn, The Economics of Regulation 32-35 (1970); J. Bonbright, Principles of Public Utility Rates, 218-23 (1961); Warren, Tax Accounting in Regulated Industries: Limitations on Rate Base Exclusions, 31 Rutgers L.Rev. 187, 189-94 (1978). Following the prevailing regulatory practice, the FPC in the order before us mandated that the deferred tax account be subtracted from the rate base, so the utility shareholders could not earn a direct return on capital contributed by ratepayers. Accounting for Premium, Discount, and Expense of Issue, Gains and Losses on Refunding and Reacquisition of Long-Term Debt, and Interperiod Allocation of Income Taxes, at 9 (F.P.C. July 6, 1976) (Order No. 530-B); J.A. 852
 
 
 [4]
 See Alabama-Tennessee Natural Gas Co. v. FPC, supra, at 336. Although this analysis has been described as "counter-intuitive" by one court that adopted it anyway, City of Los Angeles v. Public Utilities Comm'r, 15 Cal.3d 680, 125 Cal.Rptr. 779, 783, 542 P.2d 1371, 1375 (1975), it is widely acknowledged as a possible outcome. See 1 A. Kahn, Supra note 3, at 33-34
 
 
 [5]
 The long-run impact on rates of either normalization or flow-through depends on variations in tax rates, the inflation rate and on how quickly the firm expands. 1 A. Kahn, Supra note 3, at 34. A firm that declines in size or grows slowly will save money for its ratepayers by normalizing. Flow-through will keep rates low for faster-growing utilities. The greater the inflation rate the greater the benefit to ratepayers of flow-through
 
 
 [6]
 I.R.C. § 167 (1976)
 
 
 [7]
 E. g., Amere Gas Utils. Co., 15 F.P.C. 760, 779 (1956); El Paso Natural Gas Co., 22 F.P.C. 260, 267, Aff'd sub nom. El Paso Natural Gas Co. v. FPC, 281 F.2d 567 (5th Cir. 1960), Cert. denied sub nom. California v. FPC, 366 U.S. 912, 81 S.Ct. 1083, 6 L.Ed.2d 236 (1961); United Fuel Gas Co., 23 F.P.C. 127, 131, Aff'd sub nom. City of Lexington v. FPC, 295 F.2d 109 (4th Cir. 1961)
 
 
 [8]
 Alabama-Tennessee Natural Gas Co., 31 F.P.C. 208, 218-19 (1964), Aff'd sub nom., Alabama-Tennessee Natural Gas Co. v. FPC, supra
 
 
 [9]
 359 F.2d at 339. The Fifth Circuit held that for the utilities to gain a permanent tax saving would contravene the congressional intent in permitting accelerated depreciation. Id
 
 
 [10]
 Tax Reform Act of 1969, § 441(b) (codified at I.R.C. § 167(L ))
 
 
 [11]
 FPC v. Memphis Light, Gas & Water Div., 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973)
 
 
 [12]
 53 F.P.C. 2123, 2127 (1975); J.A. 341
 
 
 [13]
 For the Commission's description of the seven examples, see note 1, Supra
 
 
 [14]
 53 F.P.C. at 2126-27; J.A. 340 (footnotes omitted)
 
 
 [15]
 Accounting for Premium, Discount, and Expense of Issue, Gains and Losses on Refunding and Reacquisition of Long-Term Debt, and Interperiod Allocation of Income Taxes, at 6-8 (F.P.C. Jan. 19, 1976) (Order No. 530-A); J.A. 711-13
 
 
 [16]
 Id. at 8; J.A. 713
 
 
 [17]
 For discussion of the competition issues raised by this case, see Section V, Infra
 
 
 [18]
 Order No. 530-B, Supra note 3, at 2; J.A. 845
 
 
 [19]
 Id. at 7-9; J.A. 849-51
 
 
 [20]
 Order Denying Rehearing of Order No. 530-B (F.P.C. Sept. 3, 1976); J.A. 876
 
 
 [21]
 Id. at 3; J.A. 878
 
 
 [22]
 Since Order No. 530-B and the Order Denying Rehearing superseded the Commission's earlier pronouncements on this question, we will not address Orders Nos. 530 and 530-A in this section. Only one argument in support of CITA is present in the first two orders but not in the Commission's subsequent pronouncements: that financial conditions in the power industry necessitated adoption of CITA. The financial issue, however, was contested by petitioners, who insisted that improvement of the economy obviated any earlier concern for the utilities' ability to raise capital. Order 530-A, Supra, at 8; J.A. 713. The Commission's Order Denying Rehearing repudiated its previous reliance on "relatively short term changes in the financial health of the utility industry," Order Denying Rehearing of Order No. 530-B, Supra note 20, at 3; J.A. 878, so that question is not before us. See Initial Decision on Proposed Rate Changes, Pennsylvania Electric Co., (F.P.C. Dec. 6, 1974), at 13 (argument that normalization would improve utility's financial position a "makeweight"; such a consideration would be important for setting rate of return, not for evaluating normalization)
 
 
 [23]
 E. g., FPC v. Memphis Light, Gas & Water Div., supra, 411 U.S. at 460, 93 S.Ct. 1723; Alabama-Tennessee Natural Gas Co. v. FPC, supra, at 328, 336; Midwestern Gas Transmission Co. v. FPC, 388 F.2d 444, 447 (7th Cir.), Cert. denied, 392 U.S. 928, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968). See also City of Chicago v. FPC, 128 U.S.App.D.C. 107, 112, 385 F.2d 629, 634 (1967), Cert. denied sub nom. Public Service Comm'n of Wisconsin v. FPC, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968)
 
 
 [24]
 Although courts can require only that a "just and reasonable" rate be set, and cannot dictate ratemaking methods, FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944), there is a clear consensus that a just and reasonable rate covers the firm's costs plus an adequate return on capital. E. g. FPC v. United Gas Pipe Line Co., 386 U.S. 237, 244-45, 87 S.Ct. 1003, 1008, 18 L.Ed.2d 18 (1967) ("power and the duty of the Commission to limit cost of service to real expenses"); City of Chicago v. FPC, 147 U.S.App.D.C. 312, 330, 458 F.2d 731, 749 (1971), Cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972) ("a heavy burden on the Commission to justify" departures from cost-based ratemaking). In appropriate circumstances the Commission may consider non-cost elements in ratemaking, See Mobil Oil Corp. v. FPC, 417 U.S. 283, 320-21, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), but most alleged "departures" really involve cost factors. For example, areawide ratemaking is based on average costs of producing units with many common characteristics, Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), while the inclusion in rates of an incentive for future development simply accounts for another cost: the risk of exploration. See City of Lexington v. FPC, supra at 118; Public Service Comm'n of New York v. FPC, 191 U.S.App.D.C. 19 at 29-30, 589 F.2d 542, at 552-553 (1978)
 
 
 [25]
 E. g., Memphis Gas, Light & Water Div. v. FPC, 163 U.S.App.D.C. 130, 135-136, 500 F.2d 798, 803-04 (1974); City of Lexington v. FPC, supra; El Paso Natural Gas Co. v. FPC, supra
 
 
 [26]
 Order 530-B, Supra note 18 at 8; J.A. 851
 
 
 [27]
 Both the Natural Gas Act and the Federal Power Act aim to protect consumers from exorbitant prices and unfair business practices. This purpose can be seen in the statutory requirement that rates be just, reasonable, and nondiscriminatory. 16 U.S.C. § 824d(a), (b) (1976); 15 U.S.C. § 717c(a), (b) (1976). See FPC v. Hope Natural Gas Co., supra, 320 U.S. at 611-12, 64 S.Ct. 281; Pennsylvania Water & Power Co. v. FPC, 343 U.S. 414, 418, 72 S.Ct. 843, 96 L.Ed. 1042 (1952); MacDonald v. FPC, 164 U.S.App.D.C. 248, 256, 505 F.2d 355, 363 (1974), Cert. denied sub nom. George Mitchell & Associates v. MacDonald, 421 U.S. 912, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1974); American Public Power Ass'n v. FPC, 173 U.S.App.D.C. 36, 41, 522 F.2d 142, 147 (1975) (Bazelon, C. J., concurring). Of course, protection of the consumer includes maintaining the financial integrity of the regulated firm; but the focus of regulation remains control of the economic power of utilities that enjoy monopoly status
 
 
 [28]
 15 U.S.C. § 717r(b) (1976) ("(t)he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive"). For this analysis, we may treat this statute and the judicial review provision of the Federal Power Act, 16 U.S.C. § 825L (b) (1976) as one. The language of the two provisions is identical, and it has been held that Supreme Court rulings on the Natural Gas Act are applicable to Federal Power Act cases. Municipal Light Boards of Reading & Wakefield, Mass. v. FPC, 146 U.S.App.D.C. 294, 299-300, 450 F.2d 1341, 1346-47 (1971), Cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972)
 
 
 [29]
 See, e. g., United Gas Pipe Line Co. v. FPC, 86 U.S.App.D.C. 314, 181 F.2d 796, Cert. denied, 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607 (1950)
 
 
 [30]
 The obvious example of this is the areawide ratemaking program first upheld in the Permian Basin Area Rate Cases, supra. See also FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964)
 
 
 [31]
 E. g., American Public Gas Ass'n v. FPC, 178 U.S.App.D.C. 217, 220-221, 546 F.2d 983, 986-87 (1976) ("the Court should inquire into the factual predicate for the rule"); City of Chicago v. FPC, 147 U.S.App.D.C. 312, 321-322, 324, 458 F.2d 731, 740-41, 743 (1971) ("some inquiry into the factual predicate for rules promulgated by the Commission is required when review of those rules is sought here")
 
 
 [32]
 This requirement carries no implications for procedures to be followed by the Commission in compiling the record. As the Ninth Circuit observed in Union Oil Co. of California v. FPC, 542 F.2d 1036, 1041 (9th Cir. 1976), concerning a proposed FPC rule on data reported to the agency:
 In this case, we look to the record to see whether it contains substantial evidence which supports (the Commission's) conclusion . . . . While a detailed explanation might be sufficient . . . , there must, at least in the face of objection, be evidence that the data are reasonably available to the producers. This does not mean that the Commission must have conducted an adjudicative hearing, or, for that matter, any oral hearing. It only means that before the Commission can (act) in the face of a strong contrary showing, it must show that the judgment is reasonably supported by substantial evidence which appears somewhere in the record.
 See Superior Oil Co. v. FERC, 463 F.2d 191, 200 (5th Cir. 1977).
 
 
 [33]
 Like the orders before us, the ratemaking order in Permian Basin was developed through rulemaking procedures. Our proposed method of review directly parallels that in Public Service Commission of New York v. FPC, 167 U.S.App.D.C. 100, 511 F.2d 338 (D.C.Cir.1975), where we applied § 19(b) to an accounting rule permitting pipelines to include in their rate bases advance payments to producers. Citing the Supreme Court's opinion in Mobil Oil Corp. v. FPC, 417 U.S. 283, 309-10, 330-32, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), which involved an areawide ratemaking under § 19(b), Judge Leventhal stated:
 (T)he Supreme Court identified that the courts of appeals rather than the Supreme Court with its "narrow and circumscribed" authority had been assigned the major responsibility for assuring that the agency has given reasoned consideration to the material factors, and Determining whether there was substantial evidence to support each of the essential elements of the agency's action.
 Id. 167 U.S.App.D.C. at 107, 511 F.2d at 345 (emphasis added). See Superior Oil Co. v. FERC, 563 F.2d 191, 200 (5th Cir. 1977); Union Oil Co. of Calif. v. FPC, 542 F.2d 1036, 1041 (9th Cir. 1976).
 
 
 [34]
 This procedure for review of notice and comment rulemaking under § 19(b) examination of findings of fact to the extent the agency relies on such findings, and a requirement of reasoned decisionmaking on policy issues is similar to the standard enunciated recently by this court for "arbitrary and capricious" review of informal rulemaking under the Administrative Procedure Act. In Weyerhauser Co. v. Costle, 191 U.S.App.D.C. 309, 590 F.2d 1011, No. 76-1674 (D.C.Cir. Sept. 5, 1978), the court defined its duty as:
 to insist upon an explanation of the fact and policy concerns relied upon by the Agency in its decision; second, to see if those facts have some basis in the record; and finally, to decide whether those facts and those legislative considerations by themselves could lead a reasonable person to make the judgment that the Agency has made.
 Id., 191 of 325 U.S.App.D.C., at 1027 of 590 F.2d. See Pacific Legal Foundation v. Dept. of Transportation, 193 U.S.App.D.C. 184 at 189, n. 35, 593 F.2d 1338 at 1343, n. 35, Nos. 77-1797, et al., at 10, n. 35 (D.C.Cir. Feb. 1, 1979).
 When considering this case on remand, the Commission would have to meet the § 19(b) "substantial evidence" requirement insofar as a subsequent order had a factual predicate. As a rule directly applicable to ratemaking as soon as it takes effect, Order 530-B clearly would have a "direct and immediate effect" on consumers. The adequacy of the factual record would have to be established by the agency.
 
 
 [35]
 See note 22 Supra
 
 
 [36]
 Permian Basin Area Rate Cases, supra, 390 U.S. at 792, 88 S.Ct. at 1375
 
 
 [37]
 Id
 
 
 [38]
 The litigants have directed our attention to only one estimate of the impact on rates of adopting normalization, a study by the FPC's Office of Economics completed in September, 1974, titled "An Analysis of the Electric Utility Industry's Financial Requirements, 1975-1979." Five years out of date, the study's relevance for this case is limited for several reasons: (1) It covers only electric utilities, not the natural gas industry; (2) The discussion of increased use of normalization is imprecise, asserting that 40 percent of tax effects were then normalized, with the rest flowed through. Id. at 4. We are left uncertain as to the impact on the study's estimates of state regulatory policies, of CITA as proposed by Order 530-B, or of the expanded normalization of accelerated depreciation approved by this court in June, 1974. See Memphis Gas, Light & Water Div. v. FPC, 163 U.S.App.D.C. 130, 500 F.2d 798 (1974). Nevertheless, the Report gives some indication of the sums involved in expanding normalization, estimating that a complete switch to normalization would cost consumers almost $30 billion in higher electric rates from 1975 to 1979
 
 
 [39]
 As Judge Wisdom observed in Alabama-Tennessee Natural Gas Co. v. FPC, supra, at 339, "(C)lairvoyance is part of the daily grind of a regulatory agency. Whether flow-through or normalization is the rule, the agency must base the rule on some projection into the future."
 
 
 [40]
 Order 530-B, Supra note 3, at 9; J.A. 852
 
 
 [41]
 The dissent contends that the Commission should be upheld on the basis of its statement in Order 530 as to the financial benefits for utilities from normalization. See Dissent, at --- - --- of --- U.S.App.D.C., at 984-985 of 606 F.2d. As we noted above, See note 22 Supra, the Commission's final pronouncements on normalization appear to jettison this contention, arguing only that utilities will benefit from the reduction in uncertainty that we discuss in text at this point
 The dissent also relies on the statement in Order 530 that the Commission will grant normalization upon an "appropriate" factual showing by the utility, Dissent, at 4-6. But this procedure was also abandoned by the Commission in later orders. In Order 530-B, the agency reviewed its previous position, concluding, "Upon reconsideration, we find this reasoning to have been incorrect." Order No. 530-B, Supra note 20, at 2; J.A. 845. The Commission then announced "there is no need for a specific factual showing supporting normalization in each rate proceeding, and the Commission's policy favoring normalization should be implemented in each case." Id. at 9; J.A. 852. This is hardly a case-by-case approach, as the dissent contends.
 
 
 [42]
 Order Denying Rehearing of Order 530-B, Supra note 20, at 3; J.A. 878
 
 
 [43]
 FPC v. Texaco, Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974)
 
 
 [44]
 See Alabama-Tennessee Natural Gas Co. v. FPC, supra, at 336; "(A) ccounting for tax purposes and even the Commission's present Uniform System of Accounts may be valuable tools, but they cannot dictate ratemaking policies."
 
 
 [45]
 Petitioners also allege that by forcing wholesale consumers to pay the currently deferred tax liabilities of suppliers, Order 530-B gives such wholesalers a financial interest in the suppliers and thus will deter the wholesalers from constructing independent generating facilities. In view of the highly speculative nature of the competitive consequences alleged, we cannot say the Commission abused its discretion in passing over this claim
 
 
 [46]
 E. g., United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 372, 83 S.Ct. 1715, 1746, 10 L.Ed.2d 915 (1963) ("that banking is a highly regulated industry . . . makes the play of competition not less important but more so")
 
 
 [47]
 FPC v. Conway Corp., 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). See Atlantic Seaboard Corp. v. FPC, 131 U.S.App.D.C. 291, 404 F.2d 1268 (1968)
 
 
 [48]
 Gulf States Utils. Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973)
 
 
 [49]
 Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973)
 
 
 [50]
 Order 530-A, Supra note 15, at 9; J.A. 714
 
 
 [1]
 In Order No. 530 the Commission did not elaborate upon the nature of the "appropriate factual showings" that would be required. Elucidation followed in Order No. 530-B, from which the majority culls certain language. (Majority Op. n. 41) As I read Order 530-B it limits and defines, but does not abandon, the requirement of a factual showing. Thus the Order states:
 In Order No. 530 the Commission reviewed the changes in circumstances which supported the implementation in general of normalization, stated that normalization would be in the public interest and that "the Commission, as a matter of general policy, would favor ratemaking treatment upon a normalization basis, provided appropriate factual showings are developed in each instance." The nature of these factual showings was not elucidated in Order No. 530, and in fact, reflected some ambivalence on the part of the Commission concerning both the legal permissibility and the policy desirability of allowing normalization when its use resulted in what is variously described as a tax deferral or a tax savings. In Order No. 530-A the Commission asserted that "courts have required a finding that a tax deferral will occur rather than a permanent tax savings" in order to permit normalization of liberalized depreciation. And it stated that it would "of course . . . require a showing by the utility requesting normalization . . . that a tax deferral rather than a tax savings would occur . . ."
 Upon reconsideration, we find this reasoning to have been incorrect. For the reasons set forth below we find that there is no legal bar to the Commission either permitting or denying normalization of the tax effect associated with Timing differences in the recognization of expenses for tax purposes and for book purposes. The principles of setting just and reasonable rates forbid the normalization of tax effects only when there will in fact be a permanent difference between treatment of items for tax purposes and book purposes. Examples of such permanent differences include treatment of municipal bond interest, political contributions, or depletion allowances permitted by statute.
 In light of this conclusion, we reiterate our finding in Order No. 530 that the use of normalization for rate purposes would be beneficial and in the public interest, and announce that it would be our policy to permit such normalization upon a showing simply that the tax effect being normalized relates only to timing differences rather than to permanent differences between book and tax treatment. (J.A.845) (Emphasis in original)