**BRITISH CAR AUCTIONS, INC.**

v.

**The UNITED STATES.**

**Nos. 94–373T, 95–36T.**

United States Court of Federal Claims.

March 20, 1996.

---

**13.** Pl.App. at 246, 251.

Harry D. Shapiro, Baltimore, Maryland, attorney of record, for plaintiff.

Stuart J. Bassin, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant. Mildred L. Seidman, of counsel.

## OPINION

YOCK, Judge.

This tax refund case comes before the Court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). The plaintiff in this case is seeking to invalidate an Internal Revenue Service regulation, arguing that the regulation at issue is inconsistent with the authorizing statute and is unreasonable. For the following reasons, and after careful consideration of the record and the parties' respective briefs, it is concluded that the defendant prevails in this liability decision.

### Factual Background

In the United States, a corporation is deemed a resident, and therefore subject to tax on its worldwide income, if it is incorporated under the laws of the United States or

of any state of the United States. However, some countries, in particular the United Kingdom, allow a corporation to be a resident of that country if it is simply managed or controlled there, without regard to the place of incorporation. Thus, a corporation can be incorporated in the United States and, if it is managed or controlled in a foreign country, simultaneously be a full tax resident of both the United States and the foreign tax jurisdiction. Such corporations are referred to as dual resident corporations.

A. Statutory and Regulatory Background of 26 U.S.C. § 1503(d)

A dual resident corporation can cause particular problems, in instances such as the case at bar, when it is a member of two consolidated groups of corporations located in two separate countries. In general, countries such as the United States and the United Kingdom allow affiliated corporations to file consolidated returns, thereby allowing the losses of one affiliate to offset the income of the other members of the consolidated group. Accordingly, a dual resident corporation could be a member of a United States consolidated group, with affiliates taxable only in the United States, as well as a member of a United Kingdom consolidated group, with members taxable only in the United Kingdom. In such a case, a loss incurred by the dual resident corporation can reduce the income of both consolidated groups. This practice is frequently referred to as "double dipping."

In the mid–1980's, Congress became concerned by the possible tax consequences of double dipping and responded with the passage of 26 U.S.C. § 1503(d) as part of the Tax Reform Act of 1986. Congress's intent to eliminate double dipping through the enactment of section 1503(d) is made clear in the legislative history of the Act:

Losses that a corporation uses to offset foreign tax on income that the United States does not subject to tax should not also be used to reduce any other corporation's U.S. tax. Disallowing such losses will allow foreign and U.S. investors to compete in the U.S. economy under tax rules that put them in the same competitive position. By allowing "double dipping" (use of a deduction by two different groups), the current treatment of dual resident companies gives an undue tax advantage to certain foreign investors that make U.S. investments. The committee believes that elimination of double dipping for foreign-owned businesses will tend to put U.S.-owned and foreign-owned businesses on a competitive par.

Senate Report No. 99–313, 99th Cong., 2d Sess. 419, 420 (1986, U.S.Code Cong. & Admin.News 1986, pp. 4075, 4507, 4508). Section 1503(d) of the Internal Revenue Code ("I.R.C.") specifies that "[t]he dual consolidated loss for any taxable year of any corporation shall not be allowed to reduce the taxable income of any other member of the affiliated group for the taxable year or any other taxable year." 26 U.S.C. § 1503(d)(1) (1994). The I.R.C. continues by defining "dual consolidated loss" as "any net operating loss of a domestic corporation which is subject to an income tax of a foreign country on its income without regard to whether such income is from sources in or outside of such foreign country, or is subject to such tax on a residence basis." 26 U.S.C. § 1503(d)(2)(A) (1994). Thus, section 1503(d) enunciates the general rule that the losses of a domestic corporation subject to the income tax of a foreign country—in other words, a dual resident corporation—cannot be used to offset the income of any of its domestic affiliates. Of course, the dual resident corporation can still use its losses to reduce its own income.

The I.R.C., however, does provide for the promulgation by regulations of exceptions to the general rule that a dual resident corporation's losses cannot reduce the income of its affiliates. 26 U.S.C. § 1503(d)(2)(B), entitled "Special rule where loss not used under foreign law," notes that *"[t]o the extent provided in regulations,"* a dual consolidated loss "shall not include any loss which, under the foreign income tax law, does not offset the income of any foreign corporation." 26 U.S.C. § 1503(d)(2)(B) (1994) (emphasis added). In other words, section 1503(d)(2)(B) stipulates that "to the extent provided in regulations" the Internal Revenue Service ("IRS") *could* promulgate regulations except-

ing corporations from the general rule denying use of dual consolidated losses when, under foreign tax laws, no foreign corporation can use the dual resident corporation's losses. Pursuant to the I.R.C.'s directive that this exception shall apply "to the extent provided in regulations," the IRS promulgated temporary regulations on September 7, 1989 (the "Temporary Regulations").[1] The Temporary Regulations provide three exceptions under which an affiliate of a dual resident corporation can use the dual resident corporation's losses to offset its income. For the purposes of this litigation, the most pertinent exception is the so-called "stand-alone" exception. The regulations provide that the stand-alone exception applies if: (1) "[a]t no time after December 31, 1986, has there been any other person, corporation, or entity which, under the income tax laws of the foreign country, is permitted to use by any means the losses, expenses, or deductions of the dual resident corporation to offset income"; and (2) "[u]nder the income tax laws of the foreign country, the losses, expenses, or deductions of the dual resident corporation incurred in taxable years beginning after December 31, 1986, cannot be carried over or back to be used, by any means, to offset the income of any other person, corporation, or entity in other years." Treas.Reg. §§ 1.1503–2A(c)(1)(i)(A) and (B). In other words, the stand-alone requirement is satisfied if pursuant to the tax laws of a foreign jurisdiction, no "person, corporation, or entity" other than the dual resident corporation is permitted to use, carry back, or carry over the dual resident corporation's losses. How-

ever, the Temporary Regulations also include a proviso to the stand-alone exception in the so-called "mirror legislation" rule. Under the "mirror legislation" limitation, the stand-alone exception is inapplicable if the reason that no other entity can use, carry back, or carry over the dual resident corporation's losses is that "the income tax laws of the foreign country deny the use of losses, expenses, or deductions of its corporate residents that are also residents for tax purposes of another country to offset income of another person, corporation, or entity." Treas. Reg. § 1.1503–2A(c)(1)(ii)(B). In other words, the "mirror legislation" provision maintains the general prohibition against the use of dual consolidated losses by domestic affiliates if the foreign country has enacted legislation "mirroring" 26 U.S.C. § 1503(d). This is the case despite the fact that under the foreign income tax laws no foreign affiliate *could use* the losses of the dual resident corporation to offset its income in the foreign country.

However, while the "mirror legislation" rule denies the use of a dual resident corporation's losses by an affiliate when double dipping cannot occur, the rule addresses a concern noted by Congress that arose subsequent to the passage of 26 U.S.C. § 1503(d). It became apparent after the enactment of section 1503(d) that the United Kingdom was contemplating passage of its own dual resident corporation law. In fact, shortly after the passage of section 1503(d), the United Kingdom did enact legislation effective for the 1987 tax year denying the use of a dual resident corporation's losses by any affiliates

---

1. Final regulations were published on September 7, 1992. The Temporary Regulations were published as Treas.Reg. § 1.1503–2A, and the Final Regulations were published as Treas.Reg. § 1.1503–2. The Final Regulations only apply to taxable years after October 1, 1992, while the Temporary Regulations apply to the taxable years from December 31, 1986, through October 1, 1992. The taxable years at issue here are 1987, 1988, and 1989. However, the Final Regulations do include a provision allowing a corporation to opt to have the Final Regulations apply to tax returns prior to 1992. In fact, the plaintiff maintains that the Final Regulations also apply to the case at bar and argues that it falls within an exception located in the Final Regulations. The exception cited by the plaintiff allows a domestic affiliate of a dual resident corporation to

utilize a dual consolidated loss if the dual resident corporation enters into an agreement with the IRS under which it certifies that no portion of the dual resident corporation's losses have or will be used to offset the income of any other person under the income tax laws of a foreign country. Treas.Reg. § 1.1503–2(g)(2). At first glance, it seems to this Court that the Temporary Regulations, not the Final Regulations, apply to the case at bar. Nevertheless, this is irrelevant since the Final Regulations also include the "mirror legislation" rule and apply it to the exception relied upon by the plaintiff. *See* Treas. Reg. § 1.1503–2(c)(15) and Example 5. Thus, since this Court finds *infra* that the "mirror legislation" limitation is valid, the plaintiff would still fail to recover even if the Final Regulations did apply to the case.

located in the United Kingdom.[2] Congress identified the deleterious effects that a blanket exception to section 1503(d), based on the inability of a foreign entity to use a dual resident corporation's losses, would have. This concern was expressly stated in *The General Explanation of the Tax Reform Act of 1986* (Jt.Comm. Print 1987) (the "General Explanation"): [3]

> Congress was concerned that a foreign country, in response to this U.S. legislation, might deny loss-sharing to its corporate residents that are incorporated in the U.S. * * * Congress, foreseeing the adoption of such a rule by (for example) the United Kingdom, did not intend that such a rule of foreign law cause all the revenue gain from termination of the dual resident company device to inure to the benefit of the foreign revenue authority.

The General Explanation at 1065. Thus, Congress, albeit subsequent to the passage of section 1503(d), noted that it did not want the exceptions to 26 U.S.C. § 1503(d) to result in the United States fisc losing revenue to a foreign tax jurisdiction as a result of "mirror legislation."

## B. Factual Circumstances of This Case

The plaintiff, British Car Auctions, Inc. ("BCA"), is a Tennessee corporation that files its federal income tax returns on a consolidated basis with several of its affiliates. BCA and Auto Auctions, Inc. ("AA"), one of its subsidiaries, are both dual resident corporations of the United States and the United Kingdom. On or about April 12, 1988, BCA timely filed a corporate federal income tax return on a consolidated basis with its affiliates for the taxable year ending July 31, 1987. The tax return reported a total tax of $1,749,074. Subsequently, for the tax periods ending July 31, 1988, July 31, 1989, and December 31, 1989, BCA and its affiliates incurred net operating losses ("NOLs"). The total taxable income and NOLs incurred by BCA and its affiliates for these tax years is as follows:

|  | 7/31/87 | 7/31/88 | 7/31/89 | 12/31/89 |
|---|---|---|---|---|
| BCA, Inc. | 213,421 | 314 | 578 | (4,572,904) |
| Auto Auctions, Inc. | 31,455 | (50,718) | (84,947) | 3,611 |
| BCA Group, Inc. | 1,237 | ( 468) | 0 | 0 |
| Int. Auctions, Inc. | 5,124,385 | ( 4,282) | 19,102 | (26,357) |
| Other Subsidiaries | 5,287,316 | N/A | N/A | N/A |
| TOTAL | 10,757,814 | (55,154) | (65,267) | (4,595,650) |

Accordingly, BCA and its affiliates incurred NOLs of $55,154 for the tax period ending July 31, 1988, $65,267 for the tax period ending July 31, 1989, and $4,595,650 for the quarter ending December 31, 1989. Starting on January 2, 1993, the IRS commenced an audit of BCA's 1987 consolidated return. During the audit, BCA discussed with the IRS examiner the possibility of carrying back the 1988 and 1989 NOLs to the 1987 tax year. The primary issue raised by the IRS examiner during these discussions was whether or not BCA could use its NOLs and those of its affiliates to reduce the income of the consolidated group in light of the fact that BCA and AA were dual resident corporations. During the audit, on or around May 3, 1993, BCA filed a formal claim for a refund on a Form 1120X for the 1987 tax year based on the carry back of the 1988 and 1989 NOLs

2. Specifically, the British law provides that:
>   Notwithstanding any other provision of this Chapter, no loss or other amount shall be available for set off by way of group relief in accordance with section 403 if, in the material accounting period of the company which would otherwise be the surrendering company, that company is for the purposes of this section a dual resident investing company. Income and Corporate Taxes Act, § 404.

3. The General Explanation is also known as "the Blue Book." It is a Joint Committee report created after the passage of a particular tax act.

in the amount of $559,037. The claim was based on BCA's tax return filed on April 12, 1988.

At the conclusion of the audit, on approximately April 13, 1994, the IRS issued a Notice of Income Tax Examination Changes on a Form 4549A finding a tax deficiency of $2,185,484 for the 1987 tax year. The IRS examiner also did not allow the carry back of the 1988–1989 NOLs. The basis for the examiner's decision to deny the carry back was the finding that due to the "mirror legislation" provision contained in temporary Treas.Reg. § 1.1503–2A(c)(1)(ii)(B), BCA failed to come within the stand-alone exception provided in the regulations. As discussed earlier, the "mirror legislation" limitation precludes application of the stand-alone exception if the foreign jurisdiction has enacted its own dual resident corporation law. In this instance, the United Kingdom, the foreign jurisdiction in which both BCA and AA are resident corporations, enacted legislation similarly barring application of a dual resident corporation's losses to reduce an affiliate's income effective for the 1987 tax year. The second basis for the IRS examiner's decision was the finding that under the Final Regulations, BCA and AA were deemed to have actually used the NOLs to offset the income in a foreign country according to final Treas.Reg. § 1.1503–2(c)(15). The plaintiff eventually filed a Waiver of Restrictions on Assessment of Deficiency in Tax on Form 870 and concomitantly submitted a check to the IRS for $3,869,357. This amount represented the $2,068,463 in tax and $1,800,894 in interest that the IRS had deemed as due for the 1987 tax year. Finally, on or around May 25, 1994, BCA filed a claim for a refund of the additional taxes paid for the 1987 tax year. The claim was made in order to carry back the 1988–1989 NOLs to the 1987 tax year.

On June 6, 1994, the plaintiff filed the present Complaint with this Court, seeking a refund of taxes paid for the tax year 1987 based on the plaintiff's contention that the "mirror legislation" rule is an invalid regulation.[4] The plaintiff hypothesizes that the "mirror legislation" rule is invalid because it allegedly conflicts with 26 U.S.C. § 1503(d)(2)(B)'s mandate that the "term 'dual consolidated loss' shall not include any loss which, under the foreign income tax law, does not offset the income of any foreign corporation." The defendant filed its Answer on August 4, 1994, which included a claim for an offset. The defendant argued that if the plaintiff were to prevail on any of its claims, any recovery should be offset by any underpayment of taxes resulting from a purportedly improper deconsolidation and reconsolidation of certain BCA affiliates from 1985 through 1987.

On March 17, 1995, the defendant filed its motion for summary judgment. The plaintiff responded on April 14, 1995, by filing its opposition to the defendant's motion for summary judgment and its own cross-motion for summary judgment. A hearing on the parties' cross-motions was held in Washington, D.C., on December 12, 1995.

### Discussion

■ Summary judgment is properly granted when there are no material issues of fact; RCFC 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986), and the movant is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When both parties have moved for summary judgment, each party's motion must be evaluated on its own merits, drawing all reasonable inferences against the party whose motion is being considered. *Mingus Constructors, Inc. v. Unit-*

---

**4.** On January 13, 1995, the plaintiff filed a second Complaint, filed as docket No. 95–36T, with this Court also seeking a refund of taxes paid by BCA and its affiliates for the 1987 tax year. Similar to the 1994 Complaint, the basis for the 1995 Complaint's refund claim is the plaintiff's challenge to the "mirror legislation" rule. The only difference between the June 6, 1994 Complaint and the January 13, 1995 Complaint, is

that the former seeks recovery of federal income tax paid with the filing of BCA's 1987 tax return on April 12, 1988, while the latter seeks recovery of taxes paid on April 27, 1994, pursuant to the IRS audit of the 1987 tax year. As a result of the legal and factual similarities of the two cases, on February 10, 1995, this Court ordered the two cases consolidated.

*ed States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). A court is not compelled to decide a case on summary judgment simply because both parties have submitted summary judgment motions. However, if the record could not lead a rational trier of fact to find for the nonmoving party, there are no genuine issues, and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ The central issue in this case is the validity of the "mirror legislation" rule contained in Treas.Reg. § 1.1503–2A(c)(1)(ii)(B). As discussed earlier, the stand-alone exception allows the losses of a dual resident corporation to offset the income of a domestic affiliate if, under the laws of the foreign jurisdiction, no other "person, corporation, or entity" is permitted to use, carry back, or carry over the dual resident corporation's losses. However, the "mirror legislation" rule modifies the stand-alone exception by prohibiting application of the exception, if the reason that no other entity can use the dual resident corporation's losses under the foreign tax laws is that the foreign jurisdiction has enacted a dual resident corporation law "mirroring" 26 U.S.C. § 1503(d). Both the stand-alone exception and the "mirror legislation" rule are promulgated in regulations pursuant to the congressional directive contained in 26 U.S.C. § 1503(d) that "[t]o the extent provided in regulations" the term " 'dual consolidated loss' shall not include any loss which, under the foreign income tax law, does not offset the income of any foreign corporation." 26 U.S.C. § 1503(d)(2)(B) (1994).

The defendant claims that the "mirror legislation" rule is valid because it comports with Congress's intent, as expressed in the General Explanation, that a corporation should not be exempt from section 1503(d) of the I.R.C. when a foreign tax jurisdiction enacts legislation "mirroring" 26 U.S.C. § 1503(d). The defendant also argues that the "mirror legislation" rule protects the viability of section 1503(d) because it prevents the United States Treasury from losing money to foreign tax jurisdictions whenever the foreign jurisdiction passes its own legislation prohibiting the use of dual consolidated losses. In the alternative, the defendant argues that even if the "mirror legislation" rule is invalid, the plaintiff would not be able to recover because the entire set of exceptions promulgated by regulation under section 1503(d)'s directive would be invalid. Thus, according to the defendant, there would not be any exceptions to 26 U.S.C. § 1503(d), and the general rule under section 1503(d) that an affiliate cannot use a dual consolidated loss would apply.

The plaintiff counters that the "mirror legislation" rule is invalid because it is inconsistent with the congressional purpose underlying 26 U.S.C. § 1503(d) and is unreasonable. Specifically, the plaintiff points out that the legislative history of 26 U.S.C. § 1503(d) indicates that Congress's intent was to eliminate the practice of double dipping—the use of one dual resident corporation's losses by two consolidated groups of corporations located in the United States and a foreign tax jurisdiction. However, the plaintiff argues that the "mirror legislation" rule precludes the use of a dual resident corporation's losses by its domestic affiliates *even if* the losses cannot be used by another entity in a foreign tax jurisdiction. The plaintiff also hypothesizes that this creates the unreasonable situation in which the dual resident corporation's losses cannot be used by affiliates in either the United States or in the foreign country. Finally, the plaintiff maintains that if the "mirror legislation" provision is deemed invalid, the other exceptions promulgated by regulation should remain intact, thereby allowing the plaintiff to utilize the stand-alone exception contained in Treas.Reg. § 1.1503–2A(c)(1). In the alternative, the plaintiff avers that if the Court does find that the "mirror legislation" provision is a valid and reasonable regulation, BCA and its individual affiliates are still entitled to carry back their respective losses to the 1987 tax year, as between each individual corporate or business entity.

■ A court's role in reviewing the validity of a regulation is limited. *Thomas Int'l. Ltd. v. United States,* 773 F.2d 300, 303 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986). A

court should generally defer to an agency's determination if the regulation "'implement[s] the congressional mandate in some reasonable manner.'" *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982) (quoting *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 449–50, 19 L.Ed.2d 537 (1967)). As part of this examination into the reasonableness of a regulation, a court looks to see if the regulation "harmonizes with the plain language of the statute, its origin, and its purpose." *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). Accordingly, pursuant to these standards, the Court will look to the language, origin, and purpose of 26 U.S.C. § 1503(d) to determine whether the "mirror legislation" rule reasonably implements section 1503(d).

The Court will first look to a review of the statute itself, 26 U.S.C. § 1503(d), to determine whether the "mirror legislation" rule comports with the clear language of the statute. Section 1503(d)(1) first establishes the general rule that an affiliated corporation cannot use the losses of a dual resident corporation to offset its income:

> The dual consolidated loss for any taxable year of any corporation shall not be allowed to reduce the taxable income of any other member of the affiliated group for the taxable year or any other taxable year.

26 U.S.C. § 1503(d)(1) (1994). However, the statute later provides that "[t]o the extent provided in regulations" a dual consolidated loss shall not include any loss, which under the laws of the foreign tax jurisdiction, does not offset the income of any foreign corporation. 26 U.S.C. § 1503(d)(2)(B) (1994). The plaintiff argues that the "mirror legislation" provision is invalid because, contrary to the directive contained in 26 U.S.C. § 1503(d)(2)(B), it prohibits domestic affiliates from using the dual resident corporation's losses even when the foreign tax laws prohibit any other foreign corporation from using the losses. However, the plaintiff's construction of the statute is at odds with its plain meaning. The plaintiff interprets 26 U.S.C. § 1503(d)(2)(B) as requiring the IRS

to allow an affiliate to use a dual resident corporation's losses whenever the foreign tax jurisdiction precludes the use of those losses by any other corporation. The plaintiff reads section 1503(d)(2)(B) as a blanket exception to be applied whenever the laws of a foreign tax jurisdiction proscribe the use of the dual resident corporation's losses. However, if Congress had intended this result, it would not have limited the scope of the exceptions "[t]o the extent provided in regulations." Indeed, if a blanket exception of the sort described by the plaintiff was intended, there would be no need for regulations, only mere reference to the statute would be necessary. Thus, since Congress did not intend a blanket exception to the general rule whenever a foreign corporation was not capable of using the dual resident corporation's losses under foreign tax laws, the opposite must be true—that Congress foresaw instances in which, despite the foreign tax laws precluding the use of the dual resident corporation's losses, the general rule that a domestic affiliate cannot use the dual resident corporation's losses should still apply.

Moreover, the "mirror legislation" rule comports with section 1503(d)(2)(B)'s language providing for exceptions "to the extent provided in regulations." Congress did note in 26 U.S.C. § 1503(d)(2)(B) that there should be exceptions to the general rule proscribing the use of dual consolidated losses when the laws of the foreign jurisdiction precluded use of the losses by a foreign corporation. But the provision also stipulates that this is the case only "to the extent provided in regulations." Clearly, this does not mean that in *all* instances in which double dipping cannot occur, domestic affiliates can use the dual consolidated losses to offset their income. If this were the case, the drafters of 26 U.S.C. § 1503(d)(2)(B) could simply have omitted this introductory clause from section 1503(d) or drafted it to provide for exceptions "pursuant to regulations." The specific language, however, allows for exceptions only "to the extent provided in regulations." The specific language, however, allows for exceptions only "to the extent provided in regulations." This is plainly language of limitation, allowing for restrictions on the extent of the exceptions. The only

meaning to ascribe to this clause, then, is that when foreign law precludes the use of a dual resident corporation's losses, there *can* be exceptions, but the breadth of the exceptions would only be provided by regulation. This is the broad statutory mandate provided to the IRS by Congress, allowing the IRS, even in those instances in which double dipping cannot occur, to define when and to what extent domestic affiliates may still make use of a dual resident corporation's losses to offset its income. The "mirror legislation" rule is not abhorrent to this missive. True, the "mirror legislation" rule does not allow use of dual consolidated losses even when foreign law precludes a foreign affiliate from using the dual resident corporation's losses, however, the statute allows for this. In fact, it specifically provides for such a discretionary decision on the part of the IRS.

The next step is to determine whether the "mirror legislation" rule comports with Congress's purpose in enacting the statute. The plaintiff has pointed to two pieces of legislative history that it claims exhibits that Congress enacted 26 U.S.C. § 1503(d) solely to address the problem of double dipping—the Senate Finance Committee Report and the Conference Report. The Senate Report, in pertinent part, states that "[t]he committee believes that elimination of double dipping for foreign-owned businesses will tend to put U.S.-owned and foreign-owned businesses on a competitive par." (S.Rep. No. 99–313, 99th Cong., 2d Sess. 419, 420 (1986), U.S.Code Cong. & Admin.News 1986, pp. 4075, 4507, 4508). Next, the plaintiff points to the Conference Report which also indicates that the conferees were concerned with double dipping when they drafted 26 U.S.C. § 1503(d). The conferees, in explaining why they rejected the Senate's version of section 1503(d), stated that:

> The conferees saw no reason to prohibit application of the consolidated return rules * * * so long as the dual resident corporation's losses do not reduce both the taxable income of a foreign corporation in a foreign country and the U.S. taxable income of some other U.S. corporation.

H.R.Rep. No. 99–841, 99th Cong., 2d Sess., Vol. II 656, 657 (1986), U.S.Code Cong. & Admin.News 1986, pp. 4075, 4744, 4745). Initially, this language is not as dispositive as the plaintiff would have this Court believe because the language was inserted to provide an explanation as to why the conferees were not accepting the Senate's version of 26 U.S.C. § 1503(d), not as a rationale for enacting the Conference version of section 1503(d). Second, while it may be true that Congress was primarily concerned with eliminating the practice of double dipping when it enacted 26 U.S.C. § 1503(d), there is no indication that Congress intended that section 1503(d)'s general prohibition should not apply whenever double dipping was not present. Simply because the legislative history of a statute emphasizes one purpose does not automatically mean that Congress intended the provision to serve that purpose alone. In fact, such a conclusion is contrary to the language provided by Congress in 26 U.S.C. § 1503(d)(2)(B), allowing the IRS to define the scope of the exceptions to 26 U.S.C. § 1503(d) even when double dipping could not occur.

Perhaps more importantly, expressions of Congressional intent, embodied in the General Explanation, expressly provide for the "mirror legislation" rule. The plaintiff objects that the General Explanation, since it was prepared *after* the enactment of a statute, is not true legislative history and, accordingly, should be given little or no weight. While it is true that the General Explanation does not carry the same weight as legislative history, it has been employed as probative authority by numerous courts. *See FPC v. Memphis Light, Gas & Water Div.*, 411 U.S. 458, 472, 93 S.Ct. 1723, 1731, 36 L.Ed.2d 426 (1973) (Referring to the General Explanation as "a compelling contemporary indication" of legislative intent); *Estate of Wallace v. Commissioner of Internal Revenue*, 965 F.2d 1038, 1050–51 n. 15 (11th Cir.1992) (Noting that the General Explanation is "a valuable aid to understanding the statute."); *Bank of Clearwater v. United States*, 7 Cl.Ct. 289, 294 (1985) (Giving "substantial weight". to the General Explanation). The General Explanation is more pertinent in this case as well, because at the time 26 U.S.C. § 1503(d) was being discussed and debated in Congress, the United Kingdom had not yet passed its own dual resident corporation law. It was not

until after the passage of section 1503(d) that the United Kingdom enacted its own legislation barring the use of dual consolidated losses. Thus, the General Explanation provides an insight into Congress's response to a development that transpired subsequent to the passage of section 1503(d). As such, the General Explanation is more probative here than in other cases that chose to place less emphasis on the General Explanation. Accordingly, upon examining the General Explanation, the Court notes that it contemplates the exact provision which became the "mirror legislation" rule:

> The Act does not, however, exempt a U.S. corporation that resides in a foreign country from the rule merely because its losses do not in fact reduce foreign tax of any foreign corporation. Congress was concerned that a foreign country, in response to this U.S. legislation, might deny loss-sharing to its corporate residents that are incorporated in the U.S. * * * Congress, foreseeing adoption of such a rule by (for example) the United Kingdom, did not intend that such a rule of foreign law cause all the revenue gain from the termination of the dual resident company device to inure to the benefit of the foreign revenue authority.

The General Explanation at 1065. Thus, Congress expressed the concern that the exceptions allowed for in section 1503(d)(2)(B) should not result in the United States fisc losing revenue to a foreign tax jurisdiction simply because the foreign jurisdiction passed "mirror legislation" banning the use of dual consolidated losses in its country. Treas.Reg. § 1.1503–2A(c)(1)(ii)(B) addresses this concern through the "mirror legislation" rule. As discussed *supra*, the "mirror legislation" rule precludes application of the stand-alone exception when the foreign tax jurisdiction passes legislation "mirroring" 26 U.S.C. § 1503(d). Thus, the "mirror legislation" rule protects the United States Treasury by prohibiting use of dual consolidated losses by domestic affiliates in these instances. Thus, it is evident that the "mirror legislation" rule implements congressional intent underlying 26 U.S.C. § 1503(d).

In addition, the "mirror legislation" limitation also is in harmony with the general purpose underlying most revenue statutes. It is unreasonable to conclude that in closing the loophole for dual resident corporations with the passage of section 1503(d), Congress would want the IRS to create a series of exceptions that would cause all of the resulting revenue gains to inure instead to the benefit of a foreign tax jurisdiction. Nevertheless, this would be the result if not for the "mirror legislation" limitation. As discussed above, the stand-alone exception allows a domestic affiliate to use a dual resident corporation's losses, if, under foreign tax laws, no other foreign entity can use, carry back, or carry over the dual resident corporation's losses. However, if a foreign tax jurisdiction passes its own dual resident corporation law, the result would be that a dual resident corporation's foreign affiliates would be precluded from using the dual resident corporation's losses, while affiliates in the United States could use the losses. The result would be the United States fisc losing revenue, while the foreign tax jurisdiction would reap the benefits. This is an absurd result that Congress would never countenance. In fact, it contravenes Congress's own revenue projections included in the Senate Report on the precursor to 26 U.S.C. § 1503(d), which forecast increased revenue of over $200 million from 1987–1991 due to changes in the treatment of dual resident corporations. Indeed, it was most likely due to Congress's realization that such unintended consequences could result from a blanket exception to section 1503(d)(1), whenever a foreign tax jurisdiction precludes the use of a dual resident corporation's losses by an affiliate, that it specifically provided that the exceptions to section 1503(d) would be limited to the "extent provided in regulations." This allowed the IRS to fill in the gaps by limiting the extent of the exceptions to section 1503(d) to those situations most beneficial to the United States fisc.

Accordingly, since this Court finds that the "mirror legislation" rule comports with the clear language of 26 U.S.C. § 1503(d), its origin, and the congressional purpose underlying the Act, the Court holds that Treas.

Reg. § 1.1503–2A(c)(1)(ii)(B) is a valid regulation.

As an alternative to its primary claim that the "mirror legislation" rule is invalid, the plaintiff avers that BCA and each of its affiliates should be permitted to carry back their respective losses to offset their own income for the 1987 tax year. 26 U.S.C. § 1503(d) relates only to the use of a dual resident corporation's losses by an affiliate, and does not affect the use of a dual resident corporation's own losses to offset its own income. *See* 26 U.S.C. § 1503(d)(1) (1994); Treas.Reg. § 1.1503–2A(f)(2)(i). The defendant concedes this point. As such, each of the affiliated corporations is allowed to carry back its own losses.

However, this does not completely resolve the matter before this Court. In its Answer, the defendant asserted that any alleged overpayment due to the plaintiff should be offset. Specifically, the defendant alleges that the plaintiff and its affiliates reported their income on a consolidated basis for the tax years ending July 31, 1985, 1986, and 1987. However, the defendant maintains that income for particular affiliates that was included in BCA's consolidated returns for July 31, 1987, and July 31, 1985, was not included in BCA's July 31, 1986 consolidated return. The defendant asserts that this action constitutes an improper deconsolidation and reconsolidation of affiliates, violating the separate return limitation year rules contained in Treas.Reg. § 1.1502–21. The plaintiff did submit a reply to the defendant's offset. However, neither of the parties provided sufficiently detailed arguments concerning this issue in their briefs. As a result, both the factual and legal bases for the defendant's offset and the plaintiff's response to the defendant's claim are muddy at best. In short, this is an issue that requires more factual and legal ventilation. Thus, since the question of whether the Court should offset any overpayment by BCA or its affiliates cannot be properly addressed at this time, summary judgment regarding the amount that BCA and each affiliate may carry back to the 1987 tax year is inappropriate.

In final summary, this Court finds that Treas.Reg. § 1.1503–2A(c)(1)(ii)(B), or the "mirror legislation" rule, validly implements 26 U.S.C. § 1503(d). Nevertheless, the plaintiff and its affiliates may still carry back their own losses as between themselves. However, the Court reserves judgment on the question of the amount of the carrybacks pending further proceedings to resolve whether an improper deconsolidation and reconsolidation of BCA's affiliates occurred for the 1985–1987 tax years and, therefore, the proper amount that may be due. The parties are requested to attempt a stipulation of the amounts that may be due in this regard.

## CONCLUSION

For the foregoing reasons, the defendant prevails on the plaintiff's primary liability argument as to the validity of the IRS regulation. The Court finds that the Treasury Regulation at issue, Treas.Reg. § 1.1503–2A(c)(1)(ii)(B), validly implements 26 U.S.C. § 1503(d).

The parties are directed to submit status reports within 60 days of the date of this decision informing the Court of their further intentions in this matter, in order that this matter may be finally concluded.